## STATE OF MARYLAND *v.* JAMES McKENZIE

[App. No. 70, September Term, 1972.]

*Decided April 18, 1973.*

564

Before ORTH, C. J., and MORTON, THOMPSON, MOYLAN, POWERS, CARTER, GILBERT, MENCHINE, SCANLAN and DAVIDSON, JJ.

MOYLAN, J., delivered the opinion of the Court. DAVIDSON, J., dissents and filed a dissenting opinion at page 595 *infra*.

After a removal from Baltimore City to Baltimore County for trial, James McKenzie was convicted by a jury of murder in the first degree. On appeal to this Court and represented by the same counsel who represented him at trial, his only contention was that "it was reversible error for the defendant to testify without being advised, in the record, of his right to refuse to testify." [1] The point not having been raised and decided

1. Ironically, the very defect McKenzie raised on appeal was the precise thing his counsel had insisted upon at trial. After the defense called McKenzie to the stand, the Assistant State's Attorney asked to approach the bench. What transpired at that conference between the court and trial counsel was not transcribed. The substance of that conference, however, was revealed in a comment the Assistant State's Attorney made, in passing, at the hearing on McKenzie's new trial motion, even though it was not a ground asserted thereat:

"Now, I would, also, like to put on the record, with all

below, this Court invoked Maryland Rule 1085. We concluded the opinion, "If McKenzie honestly believes that he did not knowingly elect to testify, the avenue is open for him through post conviction procedure to air that contention." *McKenzie v. State*, No. 457, September Term, 1971 (filed February 28, 1972).

On May 1, 1972, McKenzie filed a post conviction petition raising the single contention that ". . . Petitioner honestly believes that he did not knowingly elect to testify." On that basis, he prayed a new trial. A hearing was held on his petition on July 26, 1972, before Judge John Grason Turnbull. A transcript of that hearing, with the exception of Judge Turnbull's oral opinion, is not a part of the record before us. Sufficient details of what transpired at that hearing, however, appear in the court's oral opinion, the application for leave to appeal, and the memorandum in opposition to that application, to enable us to render judgment.

At the hearing, McKenzie's trial counsel testified that he had no independent recollection of advising his client of his Fifth Amendment rights; that in a case such as this, where it was alleged the defendant acted in self-defense, it was his practice to put the defendant on the stand; and that he objected to the Assistant State's Attorney's suggestion that the court instruct the defendant about his Fifth Amendment rights prior to testifying because it might have prejudiced the case before the jury. He stated further that the defendant never objected to testifying and was willing to do so.

McKenzie testified that he was not advised by his attorney that he did not have to testify but that, even if

due respect to the Court, so the record is clear, at the time Mr. McKenzie was called to the stand, I made an objection, at which point defense counsel and myself approached the Bench, and I had asked Your Honor, at that time, to instruct or have counsel instruct the witness on his Fifth Amendment rights to take the stand or not to take the stand, and at which point Your Honor felt it was not necessary, and I would like the record to reflect that defense counsel at that time, also, indicated to Your Honor it was not necessary."

he had been so advised, he still would have taken the stand in his defense.

The Assistant State's Attorney who prosecuted the case testified regarding his suggestion at trial that the defendant be apprised of his right against compulsory self-incrimination. He further testified that he did not overhear defense counsel at any time so advise his client.

Judge Turnbull interpreted the concluding sentence in this Court's opinion affirming McKenzie's conviction as "practically an open invitation to Mr. McKenzie to file a petition for post conviction relief on the basis of what is alleged." He made the following factual findings:

> "I find as a fact Mr. Maxwell [defense counsel] did not advise this man of his right not to testify. I find as a fact that the State's Attorney did not advise him of his right and that the court did not. I find no obligation on the court or the State's Attorney to advise him of that right. I think the presumption is that counsel for the defendant has already advised him of his right when he calls him to the stand, but when counsel testifies that he just doesn't know whether he so advised him, there is no affirmative showing that he was advised of that right.
> ". . . we have a man who finished high school, got some further courses in Heidelburg when he was in Germany, I assume in the service, who has worked as a custodial guard at the Patuxent Institution, which, of itself, needs no training in court room procedures or in constitutional rights. The question arises whether or not he is presumed to know that he had a right to decline to testify. So far as I heard this morning . . . no one specifically asked him this morning if he knew that he had a right to decline to testify . . .
> ". . . of course, everyone is presumed to know the law, but a constitutional right is over and

above the law, it is basic, and a person should understand his constitutional rights when he is charged in a criminal case with a violation of the law . . .

"I cannot presume that this man knew he did not have a right (sic) to testify. I cannot therefore presume that, again using the language of the Court of Special Appeals, 'If McKenzie honestly believes that he did not knowingly elect to testify, the avenue is open to him through post conviction procedure to air that contention.' He said today that if he had been advised to decline to testify he would have testified anyway. That may be his opinion today, some thirteen almost fourteen months after trial. But I find that any defendant has a right to be advised by his counsel or by the court of his right to decline to testify. And I find that the testimony here before me today is such that, as a matter of fact, I come to the conclusion that he was not advised of that right. . ."

He indicated he would grant relief:

". . . while I don't quite know exactly what the Court of Special Appeals had in mind, it seems to me that it is more or less a directive from the court to whatever judge the post conviction proceeding came before, that if the judge came to the conclusion that he [McKenzie] was not advised of that right, that he should grant relief."

Even though he additionally found that McKenzie's testimony "was exculpatory, so that he didn't get hurt by examination on the record of attacking his credibility" —he had no criminal record—, the hearing judge signed an order, filed July 27, 1972, granting McKenzie a new trial. The State timely filed an application for leave to appeal from that order.

We note initially a gross misreading of what was but a passing dictim in our per curiam opinion on direct appeal. We explicitly invoked Maryland Rule 1085 so as not to decide an issue which had not been raised below. Our gratuitous advice in a parting sentence that McKenzie was not forever foreclosed from raising his point but was free to assert it in a post conviction petition, was by no stretch of the legal imagination the disposition of a complex constitutional question. What we intended to be a mere helpful signpost directing McKenzie on to the next appropriate forum was by no means intended to be "a directive . . . that if the judge came to the conclusion that he [McKenzie] was not advised of that right, that he should grant relief." Moreover, such a reading of the dictum would be in flat contravention of *Stevens v. State,* 232 Md. 33, 39, 192 A. 2d 73, *cert. den.* 375 U. S. 886, 84 S. Ct. 160, 11 L.Ed.2d 115 (1963).

On the merits of the ruling, we note that Judge Turnbull never found that McKenzie did not know of his right not to testify. He relied exclusively upon the fine point that McKenzie was not explicitly advised of that right either by his attorney or by the trial judge, as an issue independent of whether McKenzie actually knew of that right or not. There is no law imposing such a ritualistic catechism, in the fashion of *Boykin v. Alabama,* 395 U. S. 238, 89 S. Ct. 1709, 23 L.Ed.2d 274 (1969), or *Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), upon the decision to take the stand [2] and we would not, even if we had the power, choose to so further encumber already top-heavy trial procedures. Our de-

---

2. Indeed, although decided before *Malloy v. Hogan,* 378 U. S. 1, 84 S. Ct. 1489, 12 L.Ed.2d 653 (1964), had held that the Fifth Amendment privilege against self-incrimination was applicable to the states as part of the due process clause of the Fourteenth Amendment and before the impact of *Fay v. Noia,* 372 U. S. 391, 83 S. Ct. 822, 9 L.Ed.2d 837 (1963), had elevated the question of waiver into one of perplexing psychological dimensions in the judicial mind, *Stevens v. State, supra,* made it clear that the Court is not required to give any such advice to a defendant who is represented by counsel.

cision here, however, does not turn upon the narrowness of Judge Turnbull's ruling in this regard.

We note further that McKenzie did not incriminate himself, which could, if we chose to rest on this point, render all consideration of whether he did or did not waive his right against compulsory self-incrimination moot. His testimony, in chief and on cross-examination, was totally exculpatory. He did not have a criminal record about which to be cross-examined. There was simply no self-incrimination of any sort. It is not being facetious to suggest that even if a prosecutor were to force a protesting defendant onto the witness stand at gunpoint, the conduct, however outrageous in other regards, would not offend the Fifth Amendment unless incriminating testimony followed. The right is not against compulsion in the abstract but against compulsory self-incrimination. Even shorn of his constitutional protection, validly or invalidly, McKenzie came through unscathed. There was simply no self-incrimination.

We note, moreover, that even if a constitutional error could be deemed to have occurred, we are convinced beyond reasonable doubt that such error was harmless. *Chapman v. California*, 386 U. S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967). Not only was McKenzie's testimony exculpatory, but to give it represented the only intelligent option open to him. With his sole defense being the affirmative one of self-defense and with himself as his own indispensable witness in that regard, staying off the stand would have been tantamount to unconditional surrender. McKenzie's testimony at the post conviction hearing was, furthermore, that even if he had been advised of his right not to testify, he would nevertheless have elected to testify. McKenzie is telling us, in effect, that although he would in no event have availed himself of the privilege, he nevertheless insists upon the letter of the alleged requirement that it should have been explained to him. This is precisely the sort of legal gamesmanship which the Harmless Error Doctrine is intended to counteract. Error, if any, was palpably harmless.

Our holding is, however, that no constitutional error occurred. In reaching that holding, we are, of necessity, required to sort out and to examine a great swirl of constitutional considerations which play, with giddy interaction, upon the seemingly simple decision of whether a criminal defendant should take the witness stand: Where between lawyer and client is the allocation of decision-making responsibility? How and by whom may waiver be effected? What precisely is being waived? When does the element of compulsion attach, so that the question of valid waiver even becomes relevant? Are the standards more stringent when a defendant is not represented by counsel?; are they less stringent when he is? Which mistakes, when made, are not properly self-sufficient constitutional errors but rather mere factors in an overall incompetence of counsel equation?

We look first to the question of when waiver (whatever its quality and by whomever made) must occur, as a defendant prepares to take the stand in his own defense. Initially, no Fifth Amendment issue is involved when a defendant chooses to testify on direct examination. The constitutional protection does not run against voluntary self-incrimination nor even against foolhardy self-incrimination, but only against compulsory self-incrimination. Neither the prosecutor nor the court, of course, may call a defendant to the stand, absent a valid waiver of his Fifth Amendment privilege. The Constitution, however, does not protect a defendant against himself or against his own legal agent. If a defendant takes the stand for his own purposes and then slips and incriminates himself, it is not compulsory self-incrimination but simply his own folly. The peril is of his own making. Nobody compelled him to do it.[3] At that stage, there is no element

---

3. See *Hoffa v. United States*, 385 U. S. 293, 87 S. Ct. 408, 17 L.Ed.2d 374 (1966), at 385 U. S. 303-304, "since at least as long ago as 1807, when Chief Justice Marshall first gave attention to the matter in the trial of Aaron Burr, all have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion." Cited with approval in *Brown v. State*, 10 Md. App. 462, 472, 271 A. 2d 182. The incongruity of even using the

of compulsion, no constitutional prótection, and no question of waiver. If the matter ended there, no constitutional issue would be involved.

But the matter does not end there. The defendant who takes the stand of his own free will subjects himself to the risk of future cross-examination by the prosecuting attorney or by the court, a stage at which the element of compulsion does attach. *Brown v. United States,* 356 U. S. 148, 78 S. Ct. 622, 2 L.Ed.2d 589 (1958); *Allen v. State,* 183 Md. 603, 612, 39 A. 2d 820; *Funderburk v. State,* 12 Md. App. 481, 489, 280 A. 2d 4.[4] Because the latter may follow inexorably from the former, it becomes necessary, as a practical matter, to settle the waiver question before the defendant takes the stand in the first instance. Although the waiver is unnecessary for the voluntary direct examination itself, it must nevertheless be resolved on an anticipatory basis before the direct examination begins. The defendant, in effect, waives the privilege against compulsory self-incrimination *nunc pro tunc.* It is this mixing of the time sequences which has led to confusion about what literally is being waived. A defendant need not waive anything in order validly to testify; he only waives the right against later compulsory cross-examination. He waives before doing a thing which needs no waiver, in anticipation of its possible consequence which will need the waiver. If no cross-examination should follow, the waiver would become moot.

---

word "waiver" in this context was forcefully put by *United States v. Kimball,* 117 F. 156 (S.D.N.Y. 1902), at 163-64:

"[The privilege] means that no person shall be forced to be a witness against himself. . . . From this it follows that in a legal sense the doctrine of waiver has no application. The Constitution intends that a person shall not give incriminating evidence under compulsion. Immunity from compulsion is the right reserved. . . . The right of not being compelled, in its very nature, does not admit of waiver. Compulsion and consent—*i.e.,* waiver—cannot co-exist."

4. See also *Guy v. State,* 90 Md. 29, 32-35, 44 A. 997; *Barber v. State,* 191 Md. 555, 566, 62 A. 2d 616; *Stevens v. State, supra,* 38-39; *Nance v. State,* 7 Md. App. 433, 443, 256 A. 2d 377.

The time for decision, therefore, being before an accused first takes the stand, the question becomes one of the nature of the decision to be made. There is no hard and fast waiver standard to be applied. We recently discussed the volatile quality of waiver in *Miller v. Warden,* 16 Md. App. 614, 299 A. 2d 862. We there characterized waiver as "as protean in its manifestations as the number of constitutional rights which there are to be waived multiplied by the number of circumstances in which they may be waived . . . operating at times with fastidious forebearance, at times blithely and summarily, and frequently with coquettish inconstancy." We pointed out that although *Johnson v. Zerbst,* 304 U. S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), has become the "wellspring" for much of our waiver language, its roots are in the Sixth Amendment's right to counsel at trial and its holding that a waiver is "an intentional relinquishment or abandonment of a known right or privilege" is not appropriate to all other situations where constitutional rights may be involved.[5]

---

5. The wide divergence in the standard from right to right is apparent when one contrasts what amounted to the entering of a nolo contendere plea, whereof the Supreme Court said in *Brookhart v. Janis,* 384 U. S. 1, 86 S. Ct. 1245, 16 L.Ed.2d 314 (1966), at 384 U. S. 4, "There is a presumption against the waiver of constitutional rights," with the Fifth Amendment privilege against self-incrimination, whereof the Court of Appeals said in *Stevens v. State, supra,* at 39, "Where the accused has counsel, it is to be presumed that the accused has been informed of his rights and that when he voluntarily takes the stand he waives the protection of the constitutional and statutory provisions." And see generally, Comment, *Criminal Waiver: The Requirements of Personal Participation, Competence and Legitimate State Interest,* 54 Calif. L. Rev. 1262 (1966); White, *Federal Habeas Corpus: The Impact of the Failure to Assert a Constitutional Claim at Trial,* 58 Va. L. Rev. 67 (1972); Grano, *The Right to Counsel: Collateral Issues Affecting Due Process,* 54 Minn. L. Rev. 1175 (1970); Tigar, *The Supreme Court, 1969 Term, Forward: Waiver of Constitutional Rights: Disquiet in the Citadel,* 84 Harv. L. Rev. 1 (1970).

Where a witness has voluntarily given testimony in a trial or before a grand jury which tends to incriminate that witness, in whole or in substantial part, courts have tended to speak of that act as constituting a "waiver" of the privilege against further examination in some other setting involving the same subject matter. *Rogers v. United States,* 340 U. S. 367, 71 S. Ct. 438, 95 L. Ed. 344 (1951). Several commentators have made it clear that the legal fiction of "waiver", in this sense, has no relation to the

Indeed, the voluntary assumption of the witness stand by an accused, to testify in his own defense, is, *ipso facto*, all the waiver that is required of the privilege against subsequent cross-examination, to wit, against compulsory self-incrimination. The independent evolution of this entire doctrine (even in constitutional terms and even at the Supreme Court level) within the broad context of "Witnesses, Their Rights and Liabilities", illustrates the inappropriateness of attempting to fit it, in Procrustean fashion, into a *Johnson v. Zerbst* waiver mold.[5A]

---

type of volitional act contemplated by *Johnson v. Zerbst*. See Comment, "Waiver of the Privilege Against Self Incrimination," 14 Stan. L. Rev. 811 (1962), at 814:

> "When past disclosures by a witness have so altered the situation that continued testimony on his part would no longer tend to incriminate him, the privilege vanishes and his general duty reasserts itself. Used in this sense 'waiver' really has no independent significance; it simply reflects the logical point at which the privilege ceases by its own terms. The witness does not relinquish an otherwise viable right; rather, the right falls of its own weight for reasons quite unrelated to his subjective intent."

The point is that many "waivers" are something other than "intentional relinquishments or abandonments of known rights."

5A. Some commentators feel, with sound and forceful logic, that the very throwing of the notion of "waiver" into an equation of this sort serves only to complicate agonizingly what would otherwise be a simple proposition. The cleaner analysis would hold that once an accused has voluntarily taken the stand in his own defense, there simply is no privilege against self-incrimination upon subsequent cross-examination. It would go more efficiently to the heart of the matter to say frankly that, in these circumstances, the privilege does not apply, than to employ the convoluted reasoning and occasional fiction that the privilege is "waived." Professor Morgan in "The Privilege Against Self-Incrimination," 34 Minn. L. Rev. 1, reasoned at 43:

> "No satisfactory solution of the problem can be based upon conjectures as to an accused's speculations of imagined or possible advantages or disadvantages in later stages of the case or in other litigation. The answer should depend upon more fundamental considerations;"

The Uniform Rules of Evidence, drafted by the National Conference of Commissioners on Uniform State Laws, takes that approach in Rule 25, "Self-Incrimination: Exceptions," Subsection (g):

> "[S]ubject to Rule 21 [forbidding impeachment of an accused by proof of prior convictions unless he first introduces evidence to support his credibility], a defendant in a criminal action who voluntarily testifies in the action upon the merits before the trier of fact *does not have the*

58 Am. Jur., *Witnesses,* § 96, "Self-Incrimination: Waiver by Accused", provides:

> "An accused may waive his constitutional immunity from giving testimony against himself by offering himself as a witness. By electing to testify, the accused subjects himself to cross-examination and impeachment . . . . When he voluntarily takes the witness stand in his own behalf, he waives his constitutional privilege of not answering proper questions that may tend to convict him of the crime for which he is on trial . . . ."

The same article, at § 616, "Cross-Examination: Defendant in Criminal Case", goes on:

> "If the defendant in a criminal prosecution voluntarily offers himself as a witness in his own behalf and testifies in chief, he thereby subjects himself to a legitimate and pertinent cross-examination. He may not prevent or defeat cross-examination by claiming the protection of the constitutional provision against compulsory self-incrimination."

Without any apparent need for a more subtle probing of a defendant's or a defense attorney's mind at the moment of decision-making, the Maryland cases have flatly accepted the universal principle that a defendant who voluntarily testifies in his own behalf subjects himself, like any other witness, to cross-examination, and, thereby, waives his privilege against compulsory self-

---

*privilege* to refuse to disclose any matter relevant to any issue in the action." (Emphasis supplied)

It is more accurate to say that the privilege does not apply, than to say that it does apply but is waived. While it would be attractive thus to cut the Gordian knot, we appear bound to the convolutions by the precedents of past approaches, *e.g. Stevens v. State, supra.* In any event, we arrive at the same result, albeit in the circuitous fashion of the 12th Century Scholastics. Perhaps the intimation has been sounded for Gordian-knot-cutting in some latter day: the act of voluntarily taking the stand in one's own defense does not waive the privilege; it dissipates the privilege. One thus avoids the psychoanalytic nightmare of What is waiver?

incrimination. *Guy v. State, supra,* 32-35; *Allen v. State, supra,* 612; *Barber v. State, supra,* 566; *Stevens v. State, supra,* 38-39; *Nance v. State, supra,* 443; *Funderburk v. State, supra,* 489.

The act of voluntarily testifying in chief needs no waiver. The act of voluntarily testifying in chief is itself sufficient waiver with respect to subsequent cross-examination. That the decision to take the stand in one's own defense needs no waiver as a condition precedent is more easily grasped when it is firmly remembered that what is involved is not a negative right "not to testify" [6] but rather an affirmative right "to testify". It is a nuance, perhaps, but a crucial one conceptually. The right to testify is not constitutional, but statutory.[7] At the common law, all criminal defendants were absolutely incompetent and were barred from testifying as witnesses at their own trials. The statutory right "to testify" came late and came slowly. Only the great reform movement of the Nineteenth Century, championed by Jeremy Bentham and Sir James Fitzjames Stephen, brought the gradual amelioration from this harsh testimonial disqualification.[8] Maryland 357 of the Acts of 1876.

---

6. Fuzzy thinking can only result when an *option* "not to testify" is uncritically referred to as a *right* "not to testify". The mere behavioral truism that a statutory right "to do something" implies, by definition, the correlative option "not to do it" is a far cry from speaking of a constitutional right "not to do it". To forego an option requires only the exercise of an alternative option; to forego a constitutional right is more heavy-laden with preconditions.

7. Maryland Code, Art. 35, Sect. 4, provides, in pertinent part, "In the trial of all indictments [etc.] . . . the person so charged shall at his own request, but not otherwise, be deemed a competent witness;".

8. The competency of accused persons as witnesses was first established, in the common law world, in Maine in 1864. Within 35 years, every American jurisdiction, with the exception of Georgia, followed suit: Massachusetts, California, Vermont, and South Carolina in 1866; Connecticut, Ohio and Nevada in 1867; Minnesota in 1868; New York, New Hampshire and Wisconsin in 1869; New Jersey, Rhode Island, Arizona, Kansas, and Washington in 1871; Colorado and Montana in 1872; Indiana and Nebraska in 1873; Illinois in 1874; Idaho in 1875; Maryland and Hawaii in 1876; Missouri and Wyoming in 1877; Iowa and Utah in 1878; North Dakota and South Dakota in 1879; Oregon and New Mexico in 1880; Michigan, North Carolina, and West Virginia in 1881; Mississippi in 1882; Pennsylvania, Alabama and Arkansas in

Before that, he was absolutely barred. To avail oneself of the long-sought and hard-won right to testify involves the affirmative exercise of an active privilege, not the negative waiver of a passive protection.

Testimonial disqualification was the state of the law at the time of enactment of the Federal Constitution, the Federal Bill of Rights, the Maryland Constitutions (all four of them), and the Maryland Declaration of Rights. The provisions against self-incrimination, on both sides of the Atlantic and in all of the state constitutions as well as the federal one, were aimed exclusively at the grim admission-extracting techniques, in Tudor and early Stuart times, of the prerogative Court

---

1885; Virginia, Kentucky and Louisiana in 1886; Tennessee in 1887; Texas in 1889; Oklahoma in 1890; Delaware in 1893; Florida in 1895; Alaska in 1899. The Federal Government conferred the statutory right to testify in 1878. Canada and New Zealand permitted criminal defendants to testify in 1893. The various Australian states followed suit through the 1890's. The testimonial disqualification was removed in England in 1898. Testimonial competency was extended to defendants in Northern Ireland in 1923, in the Republic of Ireland in 1924, and in India in 1955.

The reform did not receive an unmixed reception. Joel Bishop in his *Criminal Procedure* (1880), Section 1187, fulminated, at 705-706:

> "This legislation is exactly adapted to the wants of old and practiced dissemblers, to whose faces the thought of their crimes brings no blushes, and the capacity of whose stomachs for perjury has no bounds. Such a man, when tried for crime, sits in court and watches the testimony on both sides to the end. Then he takes the stand, and, with an invented story which will harmonize all with some theory of innocence, he beguiles a credulous jury and outside public with what is perhaps in its nature impossible to be true, till he secures, at least, a disagreement. . . . [A]s a means to acquittal through perjury of those guilty persons who, for the public good, most need punishment, it has no rival."

Georgia did not remove the testimonial disqualification until 1962. The Supreme Court considered the Georgia practice in 1961 in *Ferguson v. Georgia*, 365 U. S. 570, 81 S. Ct. 756, 5 L.Ed.2d 783, and by a 7-2 vote declined to strike it down as unconstitutional. The majority opinion by Justice Brennan contains an excellent account of the history of testimonial disqualification and its gradual statutory abolition. See also 2 *Wigmore on Evidence* (3d ed., 1940), Chapter XXIV, "Interest as a Testimonial Disqualification," Section 579, "Accused in Criminal Cases; Statutory Abolition"; Popper, "History and Development of the Accused's Right to Testify," 1962 Washington University Law Quarterly 454.

578

of Star Chamber.[8A] They were not contemplated as hedges on some yet non-existent right "to testify in one's

8A. *In pari delicto* was the Court of High Commission for Ecclesiastical Offenses. The struggle between the common law courts and Lord Coke, on the one hand, and the prerogative courts, on the other hand, reached its climax during the reign of Charles I (1625-1648). What the Parliamentarians and their champion in the dock, John Lilburn, found most offensive was the practice of the royal courts of calling sundry persons before them and making inquisition into possible political and religious dissent, upon the basis of which compelled answers, charges might be brought. It was this compelled self-incrimination, on preliminary examination, as a substitute for valid presentment, which helped pave the road to Naseby and Marston Moor. No one questioned the quite different practice of requiring answers of an accused who *had been validly presented.* It was in this context that the notion was born (midwived by Coke) that *Nemo tenetur seipsum prodere* (or *accusare*)—No one should be required to produce (or accuse) himself.

The history and evolution of the privilege was traced brilliantly by Dean Wigmore initially in "Nemo Tenetur Seipsum Prodere," 5 Harv. L. Rev. 71 (1891); in expanded form in "The Privilege Against Self-Incrimination: Its History," 15 Harv. L. Rev. 610 (1902); and in final form in 8 *Wigmore on Evidence* (McNaughton Rev. 1961), Chapter 80 "Privilege Against Self-Incrimination," § 2250 "History of the Privilege," pp. 267-295. See also Morgan, "The Privilege Against Self-Incrimination," 34 Minn. L. Rev. 1 (1949); Corwin, "The Supreme Court's Construction of the Self-Incrimination Clause," 29 Mich. L. Rev. 1 (1930); Pittman, "The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America," 21 Va. L. Rev. 763 (1935).

Wigmore points out how Lord Coke, as was frequently his wont, boldly lifted the four words *nemo tenetur seipsum prodere* out of a larger context of quite opposite import: *Licet nemo tenetur seipsum prodere, tamen proditus per famam tenentur seipsum ostendere utrum possit suam innocentiam ostendere et seipsum purgare*—"Though no one is bound to become his own accuser, yet once a man has been accused by general report, he is bound to show whether he can prove his innocence and to vindicate himself." As an historical purist unwilling to be bound by the conniving of Lord Coke, even two and one half centuries later, Wigmore felt that justice was miscarrying daily in the courts of this country because of "this extraordinary maxim" which was "nothing in truth, but a misquotation consecrated by age." 5 Harv. L. Rev., at 83-88.

The checkered nature of the pedigree was eloquently expressed by the great Dean in 1891:

"If one instance better than another serves to exemplify the manner in which history may cover up the origin of a legal principle, destroy all traces of its real significance, change and recast its purpose and its use, while preserving an identity of form and leaving it with its vigor of life unabated and its legal orthodoxy untainted, it is this rule that no man shall be compelled to criminate himself." 5 Harv. L. Rev., at 71.

Dean Wigmore also taps the root of much present day difficulty in understanding the privilege. The so-called "privilege against

own defense". The Fifth Amendment privilege against self-incrimination became operative on December 15, 1791. The right of an accused to testify in his own defense in the federal courts was not conferred by Congress until March 16, 1878. The two are independent notions. The distinction today is too often blurred.

The Supreme Court has traditionally accepted the voluntary assertion of the right to testify as *per se* waiver of the privilege against self-incrimination on subsequent cross-examination. *Raffel v. United States,* 271 U. S. 494, 46 S. Ct. 566, 70 L. Ed. 1054; *Powers v. United States,* 223 U. S. 303, 32 S. Ct. 281, 56 L. Ed. 448; *Fitzpatrick v. United States,* 178 U. S. 304, 20 S. Ct. 944, 44 L. Ed. 1078; *Brown v. Walker,* 161 U. S. 591, 16 S. Ct. 644, 40 L. Ed. 819; *Reagan v. United States,* 157 U. S. 301, 15 S. Ct. 610, 39 L. Ed. 709; *Spies v. Illinois,* 123 U. S. 131, 8 S. Ct. 21, 31 L. Ed. 80. The Court has consistently viewed the issue simply in terms of an accused taking on the same opportunities and the same perils as any other witness.

---

self-incrimination" is not a single privilege but a portmanteau concept, covering with its broad umbrella not a solitary right but a cluster of separate though somewhat related rights, each with its own history and its own peculiar problems of application. Forgetting significant distinctions, we have attempted, in this latter day, to force the divergent rights, uncomfortably and heedlessly, into a single conceptual mold. They do not always fit. As Wigmore sees it:

"There is no agreement as to the policy of the privilege against self-incrimination. This is partly because there is no 'the' privilege. It is many things in as many settings. The privilege is a prerogative of a defendant not to take the stand in his own prosecution (§ 2268 *infra*); it is also an option of a witness not to disclose self-incriminating knowledge in a criminal case, and in a civil case, and before a grand jury and legislative committee and administrative tribunal (§ 2252 *infra*). It is alleged by some to apply to suppress substances removed from the body (§ 2265 *infra*), to confessions (§ 2266 *infra*) and to facts tending to disgrace (§ 2255 *infra*). It is sometimes held to apply beyond incrimination under domestic law to incrimination under foreign law (§ 2258 *infra*). Suggestions as to the policy of 'the' privilege are lurking in all of these settings and more." 8 *Wigmore on Evidence* (McNaughton Rev. 1961), Sect. 2251, "Policy of the Privilege," pp. 296-297.

Although most of the Supreme Court decisions in this area preceded its 1938 consideration in *Johnson v. Zerbst* of the quality of waiver necessary for an accused to disavow utterly his Sixth Amendment right to the assistance of counsel and to proceed to trial unaided, *Brown v. United States,* 356 U. S. 148, 78 S. Ct. 622, 2 L.Ed.2d 589, came a full twenty years after *Johnson v. Zerbst.* Nor did it deal with the self-incrimination question obliquely. "Deeming the record to raise important questions regarding the scope of the privilege against self-incrimination . . . we brought the case here," 356 U. S. at 152. In applying the criminal standard to a civil case, it clearly articulated the criminal standard, through Justice Frankfurter, at 356 U. S. 154-155:

> "Our problem is illumined by the situation of a defendant in a criminal case. If he takes the stand and testifies in his own defense, his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. '[H]e has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts'."

The Court stressed that to choose to testify is a voluntary act of the accused and that the compulsory cross-examination follows naturally in its train. It said, at 356 U. S. 156:

> "The interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination. Petitioner, as a party to the suit, was a voluntary witness. She could not take the stand to testify in her own behalf and also claim the right to be free from cross-examina-

tion on matters raised by her own testimony on direct examination."

The Supreme Court has never applied the "intentional relinquishment or abandonment of a known right" standard to this type of situation, and it would not be appropriate to do so. This law grew up as a part of the general common law on "Witnesses" and "Testimony," with its own built-in waiver standard. Waiver, unlike the laws of the Medes and Persians, is not immutable.[8B]

---

8B. Illustrative is the almost casual assumption of waiver on the part of a witness, unaided by counsel and under the compulsion of a summons, who unwittingly answers a question which might have been protected by the privilege. As the Court of Appeals said in *Adams v. State*, 200 Md. 133, 88 A. 2d 556, through Judge Henderson, at 200 Md. 143:

"Finally, the appellants contend that the court erred in declining, on defendants' motions, to advise each female witness of her constitutional right to refuse to testify on the ground that it would tend to degrade or incriminate her. We have held, however, that it is not obligatory for the court to inform a witness of such right. *Raymond v. State ex rel. Younkins*, 195 Md. 126, 129-130, 72 A. 2d 711, 712. See also *Blum v. State*, 94 Md. 375, 382, 51 A. 26, 56 L.R.A. 322. The right, where it exists, is personal to the witness and neither the prosecution nor the accused has a right to object. *In the instant case the right was waived when the witnesses did not make any such claim.*" (Emphasis supplied)

The same case, in admitting an incriminating written statement made to the police by a witness, went on, at 144-145:

"We think the statement, voluntarily made without any claim of privilege, constituted a waiver of any use to which it could properly be put. While we have found no Maryland case directly in point, it was held in *Henze v. State*, 154 Md. 332, 343, 140 A. 218, that testimony given at a former trial, without any claim of privilege, could be used by the State in another trial of the accused. If this were not so, voluntary confessions could never be used where the accused declines to take the stand. Cf. 8 *Wigmore, Evidence* (3d ed.) § 2276 (b) (4). In *Smith v. United States*, 337 U. S. 137, 149, 69 S. Ct. 1000, 93 L. Ed. 1264 it was recognized that a voluntary statement may be used in a subsequent trial on the theory of waiver, although in that case it was held that a claim had been made and sufficiently preserved at the time of the statement."

Ironically, the witness in some respects seems more in need of protection when it comes to waiver of the privilege than does an accused. The accused testifies voluntarily; the witness is under compulsion. The accused has counsel; the witness has none. The accused, already validly presented and indicted, may suffer no more than a conviction; the witness, with no basis for any charges

Oblivious at times to this mutability, too many courts draw too facile analogies to *Johnson v. Zerbst.* In the case at bar, we feel that the court below invoked *Johnson v. Zerbst* language inappropriately.

Establishing that the voluntary assertion of the affirmative right to testify is, *ipso facto,* waiver enough of the passive protection against self-incrimination, however, does not relieve us of all further duty of analysis. Some question arises as to what is "voluntary". The law here has realistically drawn a distinction between the defendant with counsel and the uncounseled defendant. The duty of the court to assist, by way of advice, the uncounseled defendant is more a matter of general due process going to fundamental fairness than it is a specific Fifth Amendment matter. Whatever the constitutional predicate, however, the duty is there. See 21 Am. Jur. 2d, *Criminal Law,* § 357; Annotation, "Duty of court to inform accused who is not represented by counsel of his right not to testify," 79 A.L.R.2d 643; *People v. Kramer,* 38 Cal. Rptr. 487 (1964); *People v. Jackson,* 178 N.E.2d 310 (Ill. 1961). Fundamental fairness demands that the uncounseled defendant be informed of the ramifications of his taking the stand and of the fact that he, indeed, has a free choice as to whether to take the stand or not. This is the position taken by the Court of Appeals in *Stevens v. State, supra,* at 39:

> "Most jurisdictions which have considered the point have held that failure by a trial court to advise a defendant not represented by counsel of his right to refuse to take the witness stand constitutes prejudicial error."

Where, on the other hand, a defendant is represented by counsel, there is no duty on the part of the trial court to offer the accused any advice on his election to testify

---

against him, may suffer the initial presentment and indictment as well as the subsequent conviction. The witness's peril, though not so immediate, seems hardly less dire.

or not to testify or to explain the ramifications of either choice. The Court of Appeals said in *Stevens,* at 39:

"[W]e do not deem it essential for the protection of a defendant's constitutional rights that he be advised by the court of his right against self-incrimination when he is represented by counsel. . . . Here, the appellant was called to the stand by his counsel and in such a case there is no requirement that the court advise him of his right to refuse to testify."

See also *Fowler v. State,* 237 Md. 508, 515, 206 A. 2d 802.[9] This is the state of the Maryland law and, under it, the State must prevail in its claim that McKenzie was erroneously awarded a new trial.

Two rationales are sometimes advanced to explain the lack of any constitutional duty on the trial judge to give advice to a counseled defendant, preparatory to that defendant's making of his election. One, and that arguably adopted by the Court of Appeals in *Stevens,* is that there is a presumption that counsel already did all that was necessary to do (whatever that may have been). The Court there said, at 39:

"In *Woodell v. State,* 223 Md. 89, 95, 162 A. 2d 468 (1960), we recognized the fact that attorneys, whether employed by the accused or court-appointed, are officers of the court and are presumed to do as the law and their duty require them. Where the accused has counsel, it is to be presumed that the accused has been informed of his rights and that when he voluntarily takes the stand he waives the protection of the constitutional and statutory provisions." [10]

9. See discussion in *State v. Roth,* 166 N.W.2d 564 (S.D. 1969).
10. Regretfully, no guidance is provided as to whether such a presumption is rebuttable or is conclusive; or, if rebuttable,

A sounder rationale, and one more in tune with present-day constitutional analysis, is that the decision to place a defendant on the stand is a decision properly vested in the attorney himself and not in his client. Some decisions involving constitutional rights are for the accused to make, after consultation with his attorney; some decisions involving constitutional rights, on the other hand, are for the attorney alone to make, without any necessity for consultation with or concurrence in by the accused. Some constitutional commentators discuss the dichotomy in terms of "the allocation of decision-making responsibility" [11]; others discuss it in terms of "personal waiver".[12] The results are the same, whatever the terminology. Where the responsibility of deciding whether to assert or to forego a certain constitutional right is allocated to the attorney, there is no requirement of personal waiver by the accused. Where the responsibility of deciding whether to assert or to forego a certain constitutional right is allocated to the accused, there must be a personal waiver by him (either expressly or by way of knowing acquiescence) if the right is validly to be foregone.

The classification scheme is sometimes set up in terms of "fundamental rights" versus "trial decisions".[13] It is sometimes set up in terms of "ends" versus "means to an end".[14] The categories are constant, however, whatever their labels or their rationales.

"Fundamental rights" is the phrase used to describe those very basic constitutional rights affecting the grand

whether the defendant's story alone is enough to rebut the presumption of waiver and switch the burden to the State of proving effective waiver.

11. White, *Federal Habeas Corpus: The Impact of the Failure to Assert a Constitutional Claim at Trial*, 58 Va. L. Rev. 67 (1972).

12. Comment, *Criminal Waiver: The Requirements of Personal Participation, Competence and Legitimate State Interest*, 54 Calif. L. Rev. 1262 (1966); Grano, *The Right to Counsel: Collateral Issues Affecting Due Process*, 54 Minn. L. Rev. 1175 (1970); Hall, Kamisar, LaFave and Israel, *Modern Criminal Procedure* (3rd ed. 1969), 1279-1282.

13. See f. 12 above.

14. See f. 11 above.

strategy of the contest itself: the mode of trial (court or jury); the even more basic decision of whether to forego trial entirely by way of a guilty plea *(Boykin v. Alabama);* the decision of whether virtually to forego trial by way of a nolo contendere equivalent *(Brookhart v. Janis);* the decision of whether to forego an appeal *(Fay v. Noia).* The decision-making responsibility in these cases is allocated to the accused (with advice, of course) and waiver must be personal.

"Trial decisions," on the other hand, is the phrase used to describe lesser constitutional judgments more tactical than strategic in nature, as to which decision must sometimes be made quickly and as to which, regardless of the question of speed, the attorney must make trained value judgments as to beneficial or detrimental impact upon the future course of the trial. Involved here are such constitutional questions as whether to forego cross-examining certain State's witnesses, to forego confrontation by non-objection to hearsay, to forego objection to illegally-seized evidence or to involuntary confessions (provided some tactical benefit might be extracted from their admission into evidence). Complete decision-making responsibility as to questions such as these is allocated to the attorney and there is no necessity for personal waiver. *Henry v. Mississippi,* 379 U. S. 443, 85 S. Ct. 564, 13 L.Ed.2d 408 (1965); *United States ex rel. Schaedel v. Follette,* 275 F. Supp. 548 (S.D.N.Y.). In a decision upholding the unfettered right of an attorney to forego objection to physical evidence, notwithstanding his client's strenuous disagreement, *Nelson v. California,* 346 F. 2d 73 (9th Cir. 1965), well articulated the rationale:

> "Does the fact that here there was prior consultation with the accused, and that he disagreed with counsel's strategy, make a legal difference? . . . Our view is that the result should be the same. Our reasons are that only counsel is competent to make such a decision,

that counsel must be the manager of the lawsuit, that if such decisions are to be made by the defendant, he is likely to do himself more harm than good, and that a contrary rule would seriously impair the constitutional guaranty of the right to counsel. . . . One of the surest ways for counsel to lose a lawsuit is to permit his client to run the trial. We think that few competent counsel would accept retainers, or appointment under the Criminal Justice Act . . ., to defend criminal cases, if they were to have to consult the defendant, and follow his views, on every issue of trial strategy that might, often as a matter of hindsight, involve some claim of constitutional right. . . ."

Justice Harlan stated the position forcefully in *Brookhart v. Janis, supra,* (concurring opinion), at 384 U. S. 8:

". . . I believe a lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval."

The majority opinion in *Brookhart* recognized the same principle, at 384 U. S. 7:

"It is true, as stated in *Henry v. Mississippi* . . . that counsel may . . . where the circumstances are not 'exceptional, preclude the accused from asserting constitutional claims . . .' "

When the attorney makes the determination that a defendant's testimony is crucial to a proper presentation of the defense, the decision to put the accused on the stand is properly one of "trial tactics." *People v. Roberson,* 195 N.E.2d 722 (Ill. 1964) ; *Richardson v. State,* 458 S.W.2d 665 (Texas 1970) ; *United States v. Gon-*

*zales,* 435 F. 2d 1004 (10th Cir. 1970) ; *United States v. Garguilo,* 324 F. 2d 795 (2d Cir. 1963).[15]

*Rhay v. Browder,* 342 F. 2d 345 (9th Cir. 1965), in making the general point that a rule requiring personal participation and decision on the part of an accused would greatly weaken the Sixth Amendment right to effective counsel, said at 349 :

> "Counsel is the manager of the lawsuit; this is of the essence of the adversary system of which we are so proud. In the nature of things he must be, because he knows how to do the job and the defendant does not. That is why counsel must be there."

The same breakdown of constitutional rights into that group wherein personal waiver is not required and that

---

15. The only authority we have found to the contrary is a one paragraph dictum, itself citing no authority, in a 1964 decision of the United States District Court for the District of Columbia in the case of *Poe v. United States,* 233 F. Supp. 173. The actual holding of the case was that bad advice, which deprived the defendant of the only defense available to him, amounted to ineffective representation in violation of the Sixth Amendment's right to counsel. In that case, counsel erroneously persuaded the defendant to stay off the stand because of counsel's mistaken belief that certain statements inadmissible in chief could have been used by the Government in cross-examination of the defendant.

That dictum is further eroded by the strong language of the United States Court of Appeals for the District of Columbia in affirming the District Court in *United States v. Poe,* 352 F. 2d 639 (1965), at 640-641:

> "Our opinion is no broader than our decision. We deal solely with the extraordinary situation in which the trial judge himself has concluded that a defendant did not have a fair trial . . . . The trial judge's conclusion that Poe did not have a fair trial is not necessarily and clearly wrong because the judge weighed, as only one factor in relation to others, the circumstance that but for counsel's mistaken impression of the law he would have put the defendant on the stand. Counsel has chosen to disclose his reason. If he had not disclosed it, or if he had indicated that his reason was a weakness in Poe's personality or a bad record, neither the District Court nor this court suggests that counsel's decision could have been questioned in any proceeding in any court. Counsel therefore remain free to keep defendants from testifying whenever counsel see fit. Any suggestion to the contrary is chimerical."

group wherein it is required or, alternatively, into that group whereover the attorney is allocated decision-making responsibility and that group whereover the accused bears the ultimate decision-making responsibility, is also sometimes explained in terms of "means to an end" versus "ends" themselves. The decision to forego trial by way of a guilty plea, virtually to forego trial by way of a nolo contendere plea, to forego an appeal, to forego a jury trial in the hopes of obtaining a lighter sentence are all decisions relating to the very end to be sought by a lawsuit. Here, the attorney must inform his client but the client himself must make the ultimate decision as to the end he seeks. Whether to forego all chance of acquittal by pleading guilty and obtaining a light sentence or whether to gamble on an acquittal at the risk of a greater sentence is a value judgment which only the accused can make for himself.

Where, on the other hand, the attorney and the accused have once agreed upon the end to be sought—an acquittal—the tactical decisions which are merely the means to that agreed-upon end are more properly made by the attorney. In White, *Federal Habeas Corpus: The Impact of the Failure to Assert a Constitutional Claim at Trial*, 58 Va. L. Rev. 67 (1972), the dichotomy was discussed in the following terms, at 72-73:

> "Of course, the content of intelligent decision making may vary, depending upon the objectives sought by the defense. For example, the defense may waive a constitutional right as a stratagem calculated to obtain acquittal. On the other hand, the defense may relinquish a claim that enhances the chance of acquittal in the hope that a lighter sentence will be imposed, should conviction ensue. In the first type of case the attorney and the defendant both work toward a clearly defined end, namely, acquittal; and the choice to be made relates to the *means* by which that end may best be achieved. The at-

torney is in a better position than the defendant to select the means intelligently, because he has the training, judgment, and necessary detachment to decide how best to present the defendant's case. Accordingly, in cases of this kind the attorney should be authorized to make the final and binding decision."

Under either analysis, it is clear that the decision made by counsel in the present case to place McKenzie upon the witness stand was a tactical one. It related not to the end sought by McKenzie—an acquittal—but rather to the most efficacious means to that end. It was a constitutional right properly falling under the head of "trial decision".

The victim in the murder trial was shot to death outside of a barroom in East Baltimore. Three witnesses, all of whom had been sequestered, were present at the scene when the shooting occurred. All three testified that McKenzie took a gun out of his pocket and fired it at the deceased. All three testified that McKenzie was the aggressor. One of the three had known McKenzie for over fifteen years.

In the face of an overwhelming case against him, McKenzie's only rational choice was to assert his claim of self-defense. He took the stand. He testified that the deceased had pulled a gun on him; that a struggle ensued during which he attempted to wrest the gun from the hand of the deceased; and that in the course of that struggle, the gun went off, killing the deceased.

McKenzie's trial counsel testified that it was always his considered practice to put a defendant on the stand when the defendant claimed that he was acting in self-defense. In this case, the circumstances were tactically compelling. Whatever chance McKenzie had of obtaining either an acquittal or a conviction in some lesser degree depended upon his convincing the jury that his version of the incident was correct. He had no criminal record. He had everything to gain and nothing to lose

by testifying. Under the circumstances, the decision was purely a matter of trial tactics and the location of the decision-making responsibility was in defense counsel and not in McKenzie; the preeminently tactical decision did not require the personal participation of McKenzie, even by way of silent acquiescence. Counsel having properly made a decision properly entrusted to him, McKenzie may not now relieve himself of its binding effect.[16]

Two points raised in the dissenting opinion occasion brief response.

The dissenting opinion places a weight upon several passing phrases in *Stevens v. State, supra,* which the phrases simply will not bear. That decision affirmed a conviction for murder in the first degree. It dealt with eight separate points, of which the one now being invoked was among the more minor. *Stevens* concerned itself, *inter alia,* with the admissibility of an inculpatory confession, with the propriety of an indictment charging the non-killer as a principle in the first degree, and with the admissibility of a res gestae statement made by

---

**16.** Emerging from the *Fay v. Noia—Henry v. Mississippi—Brookhart v. Janis* complex is the concept that when decision-making responsibility is appropriately vested in trial counsel, the decision of that counsel in asserting or in waiving a constitutional right will always have a binding effect upon an accused, except in extreme cases where some "exceptional circumstances" are present. "Exceptional circumstances" have been held to include the "grisly" Hobson's choices of foregoing an appeal rather than risking a death sentence upon retrial and foregoing a challenge to a racially-segregated jury rather than risking enraging a White Southern community. "Exceptional circumstances" also is the miscellaneous escape valve whereby an accused will not be held bound by a decision, although initially properly vested in his attorney, in circumstances where the attorney is guilty of an intolerable mistake of law or of egregiously bad judgment. Although there is a large overlap between the "exceptional circumstances" limitation on the otherwise binding effect of counsel's decision and the more general question of "incompetence of counsel", they do not appear to be necessarily coterminous. In any event, it is unnecessary for us to attempt to trace the precise parameters of this still vague concept, which the Supreme Court has not yet traced, since counsel in the present case was clearly neither incompetent nor guilty of any intolerable mistake of law or egregiously bad judgment so as to create an "exceptional circumstance." Counsel's tactics here were sound.

the murder victim several hours before her death. Sandwiched between these and four other contentions that had to be dealt with, was a one-page consideration of Stevens' claim that the trial judge had failed to advise him of his right not to take the stand.

The flat holding of *Stevens* was that the trial judge does not have to give legal advice to a defendant who is represented by counsel:

> ". . . Here, the appellant was called to the stand by his counsel and in such a case there is no requirement that the court advise him of his right to refuse to testify. 3 *Wharton's Criminal Evidence* (12th ed.), Sec. 722, citing *State v. Kelley,* 247 Pac. 146 (Ore. 1926), writ of error dism. 273 U. S. 589, 47 S. Ct. 504 (1927) ; Cf. *Cooper v. State,* 231 Md. 248, 253, 189 A. 2d 620 (1963)." 232 Md., at 39.

That this holding deals exclusively with the obligations of a trial judge, and does not carry with it any attendant implications as to the obligations of counsel, is readily apparent by a quick reference to the authorities on which *Stevens* relies. 3 *Wharton's Criminal Evidence* (12th ed.), Sec. 722, states plainly:

> "Some courts hold that if the defendant is not represented by counsel, the court must advise him of his privilege. If, however, the defendant is called as a witness in his own behalf by his own counsel, there is no requirement that the court or prosecution shall advise him of his right to refuse to testify."

*Wharton* and *Stevens,* in turn, cite *State v. Kelley,* 247 P. 146 (Ore. 1926) as authority. That case considered the issue in a single paragraph and held bluntly, at 148:

> "A kindred question is raised in the assignment of error No. 13, where the defendant Willos was called as a witness without having

been informed that it was unnecessary for him to give testimony regarding himself, but in this instance, as disclosed by the bill, he was called by his own counsel as a witness in his own behalf. Under such circumstances there is no requirement of law that the court or the prosecution shall interpose and warn him about his legal rights."

The Court, further, cited *Cooper v. State* as authority sufficiently analogous to lend some support to the text. *Cooper* dealt with the uncritical acceptance of a guilty plea tendered by counsel. Although *Cooper* has since been eroded by *Boykin v. Alabama,* its philosophy that the decisions of the defense, where counsel is present, will "ordinarily" be "accepted as a matter of course" is instructive as to the meaning of *Stevens*:

"The record discloses that the pleas were entered by counsel and received by the court without comment, and there is nothing to show that the defendant or his counsel for him ever complained, either before, during, or after trial, that the pleas were erroneously accepted by the court. *A plea of guilty entered by a defendant, who is represented by counsel and capable of participating in his own defense, is ordinarily accepted as a matter of course.* And on review, in the absence of a showing to the contrary, the trial court will be presumed to have done all that was required of it in receiving the plea." (Emphasis supplied) 231 Md. at 253.

*Stevens* contrasts the acceptance of defense decisions "as a matter of course," where counsel is present, with the obligation of the trial judge to render necessary advice, where counsel is not present. Authority for the latter proposition is given as Annotation, "Duty of court to inform accused who is not represented by counsel of his right not to testify," 79 A.L.R.2d 643 (1961).

The danger to be guarded against, where a defendant lacks the assistance of counsel, is clear. In the three New York, one Florida and one California case out of which the Annotation grew, all defendants were completely bereft of any legal assistance. In two of the cases, the prosecuting attorney himself called the defendant to the stand; in another, the judge "told" the defendant to get up on the stand; in the remaining two, the phraseology of the judge to the effect that the defendant could "take the stand," strongly suggested the obligation to do so. Each case involved the element of compulsion. The citation of the Annotation in *Stevens*, and the Annotation itself, must be read in the light of these cases, which make it clear that the requirement upon the judge to give a warning to an unrepresented defendant, is aimed at protecting the defendant from *compulsory* self-incrimination. Defendants should not be called to the stand by the prosecutor or the judge; nor should they be led to believe that they are required or expected to take the stand. The Annotation, and its supporting cases, say no more than this. The single sentence in *Stevens* which summarizes this point should not be read carelessly or overbroadly, cut loose from the moorings of its supporting authority.

The clear import of *Stevens* is that while an unrepresented defendant may require advice from the trial judge, lest he be subjected to compulsory self-incrimination,[17] the defendant who is represented by counsel clearly requires no such advice from the court. That is the holding of *Stevens*. The then-appended, two-sentence explanation that every lawyer, like every Englishman,[18] will be presumed to do his duty, is mere dicta and patently not the *sine qua non* of the decision. The dicta makes passing reference only to *Woodell v. State*, 223 Md. 89, 95, 162 A. 2d 468 (1960), which holds simply that court-appointed attorneys will be presumed, as

---

17. Even this proposition is only intimated by *Stevens*.
18. Horatio Lord Nelson, upon the commencement of the engagement off Cape Trafalgar.

officers of the court, to be as diligent as privately-retained attorneys.

*Stevens* clearly did not have before it and did not consider the subtle intra-defense relationship between a defendant and his attorney; it did not consider the question of which of the two may waive certain rights or the question of what actions may constitute adequate waiver; it did not consider where the decision-making responsibility resides for certain defense decisions. *Stevens* was decided before *Malloy v. Hogan, supra,* engrafted the self-incrimination clause of the Fifth Amendment onto the due process clause of the Fourteenth Amendment. It was decided before the impact of *Fay v. Noia, supra,* had thrust the many and perplexing psychological problems of waiver upon the consciousness of the state judiciary. Its almost conversational employment of the verb "presumed", on two occasions, cannot be read as a deliberate incorporation of the whole body of law dealing with presumptions, their character, and the questions of how, if, and by whom they may be rebutted.

One final point remains. Our discretion to determine, upon the granting of an application for leave to appeal, whether the case requires transferral to the appellate docket or whether it can be decided upon what is before us in considering the application, is not to be doubted. A survey of the dockets reveals that between 1959 and 1965, 87 applications for leave to appeal were granted by the Court of Appeals. In only 25 of those cases, representing 29% of the total, was the case transferred to the appeal docket. In 62 of the cases, representing 71% of the total, the case was remanded in the same motion with the granting of the application. See, for example, *Franklin v. Warden,* 235 Md. 619, 201 A. 2d 16; *McCloskey v. Director,* 245 Md. 497, 226 A. 2d 534; *Brown v. Warden,* 228 Md. 654, 179 A. 2d 419; *Bullock v. Director,* 231 Md. 629, 190 A. 2d 789. During the life of this Court through April 1, 1973, we have granted 98 applications for leave to appeal. In two of those, repre-

senting 2% of the total, we have granted the application and transferred the case to the appeal docket. In 96 of those, representing 98% of the total, we have remanded the case in the very act of granting the application. The Court, in granting an application, is uniquely able to determine when appellate briefs and argument might be helpful to it and when such transfer to the appeal docket would be an uneconomical, time-consuming and needless ritualism.

We have, in the exercise of our discretion, elected to consider this case upon its merits contemporaneously with our granting of the application for leave to appeal. The facts are not in dispute. The legal issue is cleanly framed. The issue is, moreover, not one which we have randomly chanced upon, but rather one which has long concerned this Court. Our decision to reach it upon the merits is not lightly taken. The entire Court has given the question weighty thought and extensive legal research. We do not feel that any useful purpose whatsoever could have been served by placing the case upon the formal calendar, for the submission of printed briefs and for the hearing of oral argument. We are acquainted with the considerations and with the arguments, pro and con. We have acted deliberately to resolve a question which, in our considered judgment, has long cried for resolution.

> *Application for leave to appeal granted; order of July 27, 1972, granting McKenzie a new trial reversed. Mandate to issue forthwith.*

*Davidson, J., dissenting:*

James McKenzie was convicted by a jury of murder in the first degree. On May 1, 1972, he filed a post-conviction petition raising the single contention that he did not knowingly elect to testify at his trial. He sought a new trial. A hearing was held on his petition on July 26, 1972. In his opinion, Judge Turnbull set forth that

McKenzie's trial counsel testified that he had no indepen-
dent recollection of advising his client of his Fifth
Amendment rights; that the defendant never objected
to testifying; and that the defendant was willing to do
so. Judge Turnbull further indicated that McKenzie
testified that he was not advised by his attorney that he
did not have to testify, but that even if he had been so
advised, he still would have taken the stand in his de-
fense. Judge Turnbull found that neither defense coun-
sel, the State's Attorney or the court had advised Mc-
Kenzie of his right not to testify. He stated that "no one
specifically asked him this morning if he knew that he
had a right to decline to testify." He made no finding
as to the critical fact of whether McKenzie knew or did
not know of his right to decline to testify. He concluded
that because McKenzie had not been advised of that
right, he was entitled to relief, and granted him a new
trial. The State filed an application for leave to appeal
from that order.

The majority, resting its decision upon the ground
that no constitutional error occurred, finds the applica-
tion for leave to appeal meritorious, grants the applica-
tion, and reverses Judge Turnbull's order. It does so
notwithstanding the absence of a transcript of the testi-
mony at the July 26, 1972, hearing, necessary, in my
view, for the independent appraisal of the record, re-
quired of this Court when deciding a constitutional is-
sue, *English v. State,* 16 Md. App. 439, 443, 298 A. 2d
464, 467 (1973); *Gardner v. State,* 10 Md. App. 233,
245-46, 269 A. 2d 186, 192 (1970), *cert. denied,* 404
U. S. 937, 92 S. Ct. 279 (1971); *Dillingham v. State,*
9 Md. App. 669, 714, 267 A. 2d 777, 801, *cert. denied,* 259
Md. 731 (1970) (Orth, J., concurring), and without the
benefit of briefs and oral argument by the parties.

Code (1957), Art. 27, § 645-I, insofar as here relevant,
provides:

> "Any person . . . aggrieved by the order of
> the court . . . may within thirty (30) days

after the passage of said order apply to the Court of Special Appeals for leave to prosecute an appeal therefrom. . . . If the application to prosecute such appeal shall be granted, *the procedure thereafter shall be in conformity with the rules of said appellate courts* and the courts may affirm, reverse or modify the order appealed from, or they may remand the case for further proceedings, but if said application is denied, the order sought to be reviewed shall thereby become final." (Emphasis added.)

Maryland Rule BK47, insofar as here relevant, similarly provides:

"If leave to appeal shall be granted *further proceedings shall be had pursuant to . . . Chapter 1000 (Appeals to the Court of Special Appeals)* as if the order granting leave to appeal were the order of appeal filed pursuant to Rule . . . 1012 (Appeal-Time for Filing) . . . ." (Emphasis added.)

These provisions would appear to mandate that in post-conviction proceedings, after a petition for leave to appeal is granted, all of the procedures applicable to direct appeals are to be followed before a decision is reached on the merits. Such procedures include the transmittal to this Court of a transcript of the testimony at a post-conviction hearing and the right of the parties to file briefs and present oral argument.

As set forth in Part II below, I believe there is merit to the application for leave to appeal and I would, therefore, grant the application. But regardless of whether Maryland Rule BK47 is mandatory, as it would appear to be on its face, or discretionary, as the majority asserts, I would set the appeal for further consideration in accordance with the rules set forth in Chapter 1000 and would not now reverse the order below.

## II

Even assuming that the merits should be disposed of at this time, I could only concur with the result reached by the majority; I could not agree with its opinion. Before reaching its conclusion that McKenzie's constitutional rights were not violated, the majority sets forth three other grounds which it asserts would warrant granting the application for leave to appeal and reversing the order for a new trial. One of those grounds invoked the "harmless error" doctrine that even if a constitutional error could be deemed to have occurred, such error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U. S. 18, 87 S. Ct. 824 (1967). If the record shows that McKenzie testified that, even if he had been advised of his right not to testify, he would in no event have availed himself of that right and would nevertheless have elected to testify, I would agree that any constitutional error which might have occurred was harmless beyond a reasonable doubt.

Declining to rest upon the doctrine of harmless error or either of the two other grounds which it asserts would have disposed of the case, the majority goes further to decide that no constitutional error did in fact occur. In so doing it eschews three sound and universally practiced judicial policies: not to pass upon a constitutional question, although properly presented by the record, if there is also present some other ground upon which to dispose of the case; not to decide questions of a constitutional nature unless absolutely necessary to a decision of the case; and not to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. *Alexander v. Louisiana,* 405 U. S. 625, 633, 92 S. Ct. 1221, 1226-27 (1972); *Ashwander v. Tennessee Valley Authority,* 297 U. S. 288, 346-48, 56 S. Ct. 466, 482-83 (1936) (Brandeis, J., concurring), and cases cited therein; *Tauber v. Montgomery County,* 244 Md. 332, 337-38, 223 A. 2d 615, 618 (1966); *Middleman v. Maryland-National Capital P & P Comm'n,*

232 Md. 285, 289-90, 192 A. 2d 782, 784 (1963); *Tyler v. The State*, 93 Md. 309, 314, 48 A. 840, 842 (1901); *State v. Insley*, 64 Md. 28, 30-31, 20 A. 1031 (1885).[1]

The decision of the majority, in disregard of these principles, proceeds to assert for the first time, insofar as I can discern, that the right of a defendant not to incriminate himself by taking the stand and exposing

---

1. The foundations for these self-imposed restraints are stated in *Rescue Army v. Municipal Court*, 331 U. S. 549, 571-72, 67 S. Ct. 1409, 1421 (1947), by Justice Rutledge as follows:

"The policy's ultimate foundations, some if not all of which also sustain the jurisdictional limitation, lie in all that goes to make up the unique place and character, in our scheme, of judicial review of governmental action for constitutionality. They are found in the delicacy of that function, particularly in view of possible consequences for others stemming also from constitutional roots; the comparative finality of those consequences; the consideration due to the judgment of other repositories of constitutional power concerning the scope of their authority; the necessity, if government is to function constitutionally, for each to keep within its power, including the courts; the inherent limitations of the judicial process, arising especially from its largely negative character and limited resources of enforcement; withal in the paramount importance of constitutional adjudication in our system.

"All these considerations and perhaps others, transcending specific procedures, have united to form and sustain the policy. Its execution has involved a continuous choice between the obvious advantages it produces for the functioning of government in all its coordinate parts and the very real disadvantages, for the assurance of rights, which deferring decision very often entails. On the other hand it is not altogether speculative that a contrary policy, of accelerated decision, might do equal or greater harm for the security of private rights, without attaining any of the benefits of tolerance and harmony for the functioning of the various authorities in our scheme. For premature and relatively abstract decision, which such a policy would be most likely to promote, have their part too in rendering rights uncertain and insecure.

"As with the case and controversy limitation, however, the choice has been made long since. Time and experience have given it sanction. They also have verified for both that the choice was wisely made. Any other indeed might have put an end to or seriously impaired the distinctively American institution of judicial review. And on the whole, in spite of inevitable exceptions, the policy has worked not only for finding the appropriate place and function of the judicial institution in our governmental system, but also for the preservation of individual rights."

himself to cross-examination is not a fundamental personal right but is rather a matter of trial tactics committed to the discretion of counsel, without regard to the defendant's awareness of that right. Thus the majority holds that a defendant who is represented by counsel does not have the right to be advised of or to know of the existence of his right not to testify.

This conclusion rejects the decision of the Court of Appeals in *Stevens v. State,* 232 Md. 33, 39, 192 A. 2d 73, 77, *cert. denied,* 375 U. S. 886, 84 S. Ct. 160 (1963). There that Court said:

> "Of course, a defendant has the right, under Article 22 of the Maryland Declaration of Rights and under Code (1957), Art. 35, Sec. 4, to refuse to give evidence against himself. Most jurisdictions which have considered the point have held that failure by a trial court to advise a defendant not represented by counsel of his right to refuse to take the witness stand constitutes prejudicial error. See cases collected in Anno., 79 A.L.R.2d 643 (1961). However, we do not deem it essential for the protection of a defendant's constitutional rights that he be advised by the court of his right against self-incrimination when he is represented by counsel. In *Woodell v. State,* 223 Md. 89, 95, 162 A. 2d 468 (1960), we recognized the fact that attorneys, whether employed by the accused or court appointed, are officers of the court and are presumed to do as the law and their duty require them. Where the accused has counsel, *it is to be presumed that the accused has been informed of his rights* and that when he voluntarily takes the stand he waives the protection of the constitutional and statutory provisions. Here, the appellant was called to the stand by his counsel and in such a case there is no requirement that the court advise him of his right

to refuse to testify." (Citations omitted.) (Emphasis added.)

*Stevens* states that it is the duty of counsel to inform the defendant of his rights. While it holds that the performance of the duty may be presumed, *Stevens* does not hold that the presumption is irrebuttable or that rebuttal of the presumption is immaterial. The majority dismisses the Court of Appeals' rationale for its conclusion in *Stevens* in favor of a "sounder" rationale never before expressed by any court, from which it concludes that a lawyer has no duty to advise a client of his right not to take the stand.

Moreover, there is substantial authority that the decision whether or not to testify is both a fundamental and personal right of the accused in a criminal case.

In *Boyd v. United States,* 116 U. S. 616, 631, 6 S. Ct. 524, 533 (1886), the Fifth Amendment right against self-incrimination was intertwined with the Fourth Amendment right against unreasonable searches and seizures. There, Justice Bradley, said:

> "And any compulsory discovery *by extorting the party's oath,* or compelling the production of his private books and papers, to convict him of a crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom." (Emphasis added.)

In *Bram v. United States,* 168 U. S. 532, 543-45, 18 S. Ct. 183, 187-88 (1897), Justice White said:

> "In *Boyd v. United States,* 116 U. S. 616, attention was called to the intimate relation existing between the provision of the fifth amendment

securing one accused against being compelled to testify against himself, and those of the fourth amendment protecting against unreasonable searches and seizures; and it was in that case demonstrated that both of these amendments contemplated perpetuating, in their full efficacy, by means of a constitutional provision, principles of humanity and civil liberty which had been secured in the mother country only after years of struggle, so as to implant them in our institutions in the fullness of their integrity, free from the possibilities of future legislative change.

\* \* \*

"There can be no doubt that long prior to our independence the doctrine that one accused of crime could not be compelled to testify against himself had reached its full development in the common law, was there considered as resting on the law of nature, and was embedded in that system as one of its great and distinguishing attributes."

In *Mapp v. Ohio*, 367 U. S. 643, 656-57, 81 S. Ct. 1684, 1692 (1961), the Supreme Court repudiated the concept that the privilege against self-incrimination was merely a rule of evidence "best defended not as an unchangeable principle of universal justice, but as a law proved by experience to be expedient." *Twining v. New Jersey*, 211 U. S. 78, 113, 29 S. Ct. 14, 25. In *Mapp*, Justice Clark said:

"We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an 'intimate relation' in their perpetuation of 'principles of humanity and civil liberty [secured] . . . only after years of struggle,'

*Bram v. United States*, 168 U. S. 532, 543-544 (1897). They express 'supplementing phases of the same Constitutional purpose—to maintain inviolate large areas of personal privacy.' *Feldman v. United States*, 322 U. S. 487, 489-490 (1944). The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence—the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence. Cf. *Rochin v. California*, 342 U. S. 165, 173 (1952).

In *Malloy v. Hogan*, 378 U. S. 1, 84 S. Ct. 1489 (1964), the Fifth Amendment right against self-incrimination was elevated to full equality with the guarantees of the First Amendment, the prohibition against unreasonable searches and seizures of the Fourth Amendment and the right of counsel guaranteed by the Sixth Amendment by being made enforceable against the states under the Fourteenth Amendment. There, Justice Brennan quoted Dean Griswold as follows:

> " 'I believe the Fifth Amendment is, and has been through this period of crisis, an expression of the moral striving of the community. It has been a reflection of our common conscience, a symbol of the America which stirs our hearts.' " 378 U. S. at 9 n. 7, 84 S. Ct. at 1494 n. 7 (1964).

In *Miranda v. State of Arizona*, 384 U. S. 436, 442, 86 S. Ct. 1602, 1620 (1966), Justice Warren said:

> "Thus we may view the historical development of the privilege as one which groped for the proper scope of governmental power over the citizen. As a 'noble principle often transcends its origins,' the privilege has come rightfully to be recognized in part as an individual's substantive right, a 'right to a private enclave

where he may lead a private life. That right is the hallmark of our democracy.' *United States v. Grunewald,* 233 F. 2d 556, 579, 581-582 (Frank, J., dissenting), rev'd 353 U. S. 391, 77 S. Ct. 963, 1 L.Ed.2d 931 (1957). We have recently noted that the privilege against self-incrimination—the essential mainstay of our adversary system—is founded on a complex of values. All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government —state or federal—must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' 8 Wigmore, Evidence 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth. In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' *Malloy v. Hogan,* 378 U. S. 1, 8, 84 S. Ct. 1489, 1493, 12 L.Ed.2d 653 (1964)." (Citations omitted.)

There the right against self-incrimination was again equated to the Sixth Amendment right to counsel, when Justice Warren said:

"These precious rights were fixed in our Constitution only after centuries of persecution and struggle. And in the words of Chief Justice Marshall, they were secured 'for ages to come, and * * * designed to approach immortality as nearly as human institutions can approach

it,' *Cohens v. Commonwealth of Virginia,* 6
Wheat. 264, 387, 5 L. Ed. 257 (1821)." 384
U. S. at 442, 86 S. Ct. at 1611.

In *Wilson v. United States,* 149 U. S. 60, 66, 13 S. Ct.
765, 766 (1893), the highly personal nature of the right
to remain silent was described by Justice Field, who
wrote:

> "But the act was framed with a due regard
> also to those who might prefer to rely upon the
> presumption of innocence which the law gives
> to every one, and not wish to be witnesses. It
> is not every one who can safely venture on the
> witness stand though entirely innocent of the
> charge against him. Excessive timidity, ner-
> vousness when facing others and attempting to
> explain transactions of a suspicious character,
> and offences charged against him, will often
> confuse and embarrass him to such a degree as
> to increase rather than remove prejudices
> against him. It is not every one, however honest,
> who would, therefore, willingly be placed on
> the witness stand. The statute, in tenderness to
> the weakness of those who from the causes
> mentioned might refuse to ask to be a witness,
> particularly when they may have been in some
> degree compromised by their association with
> others, declares that the failure of a defendant
> in a criminal action to request to be a witness
> shall not create any presumption against him." [2]

The same concept was expressed in a different way in
*Murphy v. Waterfront Comm'n of New York Harbor,*
378 U. S. 52, 55, 84 S. Ct. 1594, 1596-97, where Justice
Goldberg said:

---

[2]. The Wilson decision rested not on the Fifth Amendment, but
on an Act of Congress. In *Griffin v. State of California,* 380 U. S.
612, 613, 85 S. Ct. 1229, 1232, (1965), the Supreme Court said:
"If the words 'Fifth Amendment' are substituted for 'act' and
for 'statute', the spirit of the Self-Incrimination Clause is re-
flected."

"The privilege against self-incrimination 'registers an important advance in the development of our liberty—"one of the great landmarks in man's struggle to make himself civilized."' *Ullman v. United States,* 350 U. S. 422, 426. It reflects many of our fundamental values and most noble aspirations . . . *our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life,' United States v. Grunewald,* 233 F. 2d 556, 581-582 (Frank, J., dissenting), rev'd 353 U. S. 391, our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes 'a shelter to the guilty,' is often 'a protection to the innocent.' *Quinn v. United States,* 349 U. S. 155, 162." (Footnote omitted.) (Emphasis added.)

An accused has the right to remain silent "unless he chooses to speak in the unfettered exercise of his own will." *Malloy v. Hogan, supra,* 378 U. S. at 8, 84 S. Ct. at 1493. Until he exercises his own will and voluntarily relinquishes this right by taking the stand, it remains his. *Miranda v. State of Arizona, supra,* 384 U. S. at 460, 86 S. Ct. at 1620. The courts have clearly enunciated what constitutes a voluntary relinquishment of a constitutional right. "A waiver is ordinarily an intentional relinquishment or abandonment of a known. right or privilege." *Johnson v. Zerbst,* 304 U. S. 458, 464, 58 S. Ct. 1019, 1023 (1938). It consists of "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States,* 397 U. S. 742, 748, 90 S. Ct. 1463, 1469 (1970). In order to relinquish a known right or privilege intelligently, the accused must know of its existence. *Boykin v. Alabama,* 395 U. S. 238, 242-43, 89 S. Ct. 1709, 1712 (1969); *Application of Gault,* 387 U. S. 1, 55, 87 S. Ct. 1428, 1458 (1967); *Miranda v. State of Arizona,*

*supra,* 384 U. S. at 468, 86 S. Ct. at 1624; *Escobedo v. State of Illinois,* 378 U. S. 478, 490-91, 84 S. Ct. 1758, 1764-65 (1964); *Johnson v. Zerbst, supra.* Knowledge of the existence of the right is the "threshold requirement for an intelligent decision as to its exercise." *Miranda v. State of Arizona, supra,* 384 U. S. at 468, 86 S. Ct. at 1624.

Indeed, only recently, this Court has similarly recognized an accused's right to know that he has a right not to take the stand and not to testify. In *English v. State,* 16 Md. App. 439, 446, 298 A. 2d 464, 469 (1973), a post-conviction proceeding involving the question of the propriety of the acceptance of a guilty plea, Chief Judge Orth said:

> "The Fifth Amendment privilege against self-incrimination means 'the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty * * * for such silence.' *Malloy v. Hogan,* 378 U. S. 1, 8. Therefore, in order for an accused to waive the privilege against self-incrimination as it applies to his trial on a criminal charge he *must understand that he has the right not to testify* and that no unfavorable inference may arise from his not testifying. Unless the record affirmatively shows that he understood this privilege and waived it in the constitutional sense, acceptance of his plea of guilty is not effective." (Emphasis added.)

In the face of these authorities, I cannot subscribe to the rationale of the majority opinion which would relieve an attorney of his duty to advise his client of his right to decline to testify and would render it immaterial whether the defendant knew of that right. I cannot, like my brothers, reject *Stevens, supra,* which makes it clear that the attorney has such a duty. While the Supreme Court has never applied the test of intentional relin-

quishment or abandonment of a known right to an accused's decision to take the stand, it has determined that the right against self-incrimination is "comprehensive." *Application of Gault, supra,* 387 U. S. at 47, 87 S. Ct. at 1454. It protects the accused "in any proceeding, be it criminal or civil, administrative or judicial, investigatory or adjudicatory." *Murphy v. Waterfront, supra,* 378 U. S. at 93, 84 S. Ct. at 1611 (Justice White, concurring) ; *Application of Gault, supra,* 378 U. S. at 47, 87 S. Ct. at 1454. The accused must know of this right in a juvenile proceeding, *Application of Gault, supra,* 387 U. S. at 55, 87 S. Ct. at 1458; prior to pre-trial custodial police interrogation, *Miranda v. State of Arizona, supra,* 384 U. S. at 479, 86 S. Ct. at 1630; *Escobedo v. State of Illinois, supra,* 378 U. S. at 491, 84 S. Ct. at 1765; and before he enters a guilty plea, *Boykin v. Alabama, supra,* 395 U. S. at 242-43, 89 S. Ct. at 1712; *English v. State, supra,* 16/Md. App. at 446, 298 A. 2d at 469. I am not prepared today, as are my brothers, to say that an accused's right to know that he need not take the stand at trial is of any less significance.

In my view this Court is not, as the majority states, "of necessity required to sort out and to examine a great swirl of constitutional considerations which play, with giddy interaction, upon [this] seemingly simple decision. . . ." Rather this "complex constitutional question" should only be decided when it is necessary for disposition of the case, and then only after it has been fully and properly presented to the Court.

I respectfully dissent.