## EDDIE NANCE *v.* STATE OF MARYLAND

[No. 362, September Term, 1968.]

*Decided August 8, 1969.*

434

The cause was argued before MURPHY, C.J., and AN-
DERSON, MORTON, ORTH, and THOMPSON, JJ.

*Raymond W. Russell* for appellant.

*Thomas N. Biddison, Jr., Assistant Attorney General,*
with whom were *Francis B. Burch, Attorney General,
Arthur A. Marshall, Jr., State's Attorney for Prince
George's County,* and *Benjamin R. Wolman, Assistant
State's Attorney for Prince George's County,* on the brief,
for appellee.

ANDERSON, J., delivered the opinion of the Court.

Appellant, Eddie Nance, was tried in the Circuit Court
for Prince George's County by a jury, Judge Robert B.
Mathias presiding, upon Indictments No. 7744, No. 7745
and No. 7746. In Indictment No. 7744 he was convicted
of the crime of burglary and sentenced to 10 years un-
der the jurisdiction of the Department of Correction. In
Indictment No. 7745 he was convicted of the crimes of
robbery with a deadly weapon (1st count) ; assault and
battery (5th count) ; and larceny (6th count) ; and sen-
tenced to terms of 10 years consecutive with the sentence
imposed in Indictment No. 7744, 5 years concurrent with
the sentence imposed in Indictment No. 7745 (1st count),

and 5 years concurrent with the sentence imposed in Indictment No. 7745 (5th count). In Indictment No. 7746, in which he was charged with the crimes of rape and assault with intent to rape, he was found not guilty.

Upon this appeal the appellant raises the following contentions:

1. That the pre-trial identification procedure was improper;
2. That the evidence was not sufficient to go to the jury;
3. That the lower court erred in its ruling concerning the use of a prior conviction to impeach the appellant's testimony;
4. That the court erred in its instructions to the jury.

Briefly the facts of the crime are as follows: On the evening of January 15, 1968, Mr. and Mrs. Clifton Jackson were at their home in Accokeek, Maryland, with their three foster sons, Preston James (age 15), Montell James (age 12) and Gary Draughn (age 10), and Mrs. Jackson's aunt, Mrs. Evelyn Matthews. At about 7:00 p.m. four men came into the house on the pretext that they wanted to use the Jackson's telephone. Once inside, one of the men drew a pistol. The men remained in the house for 45 or 50 minutes, during which time the family was forced at pistol point to lie on the floor. During that time Mrs. Jackson was taken into a bathroom and sexually molested, Preston James was beaten, the house was ransacked, and certain goods were stolen.

## I—PRE-TRIAL IDENTIFICATION

Shortly after the intruders left the Jackson home, Mr. Jackson called the Prince George's County Police. Detective Thomas Reilly and Detective Sergeant Rutherford went to the house and talked to each person in the household individually. Detective Reilly personally spoke with Mr. Jackson, Mrs. Jackson, and Preston James and received descriptions of each of the four intruders from

them. Detective Reilly then returned to the station house and selected six "mug" photographs of persons matching the descriptions given by the Jacksons from the police files. A photograph of one Francis Delilly was intentionally selected from the file, while five other photographs were selected at random. On the following afternoon Detective Reilly, accompanied by Detective Lieutenant Bryan, returned to the Jackson house with the six photographs. He placed the photographs face up on a coffee table in the living room and had each person in the household view them individually and then collectively. He did not point out any one of the pictures for their particular attention. Detective Reilly testified that Mr. Jackson first viewed the photographs individually, then Mrs. Jackson viewed them, followed by Preston, then Montell, and then Gary. The family then viewed them collectively. During the time the family was looking at the photographs, Mr. Jackson spoke to the boys and told them to be sure not to pick the wrong photograph. Preston James testified that during the time the family viewed the photographs together there was conversation among them such as, "What do you think about this?" and "Do you think maybe he is the one?"

After viewing the photographs, Mr. Jackson, Mrs. Jackson and Preston James identified the appellant as one of the intruders. Detective Reilly testified that Montell James also identified the appellant from the photographs, though Montell's testimony at trial contains no reference to a photographic identification.

On January 18, Detective Reilly returned to the Jackson house and had the family again view the photographs he had shown them on January 16. The family members again identified the appellant. A second group of photographs, containing pictures of two other suspects but no picture of appellant, was also viewed by the family members on January 18.

On March 7, 1968, the appellant was taken to the United States District Court in Washington, D. C. for an

extradition hearing following his arrest. Mr. and Mrs. Jackson were seated in the courtroom with a Maryland deputy sheriff, Mr. Jackson having been told that the police had a suspect and having been asked to attend the hearing "to identify the man who was at my house." While Mr. and Mrs. Jackson were seated in the courtroom, the appellant, dressed in "civilian clothes," entered the courtroom from the rear and walked into court ahead of a man whom Mr. Jackson later learned was a deputy marshal. When Mr. Jackson saw the appellant coming down the aisle he said to the deputy sheriff, "That is the man that held us up."

At trial Mr. Jackson, Mrs. Jackson and Preston James each made an in-court identification of the appellant. Each testified also to having made the photographic identifications adverted to above. Mr. Jackson testified also as to his identification of the appellant at the extradition hearing.

The appellant moved to suppress the pre-trial identifications and that motion was denied. The appellant contends that the photographic identifications were made under unduly suggestive conditions and were thus in violation of his right to due process of law and that the identification made at the extradition hearing violated his rights to counsel and to due process of law.

With regard to the photographic identifications, the rule to be followed is that if it is shown that a pre-trial identification by photograph, on the totality of the circumstances surrounding it, was so unduly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, the admission of evidence of such identification or a subsequent in-court identification is determined pursuant to the exclusionary rules of *United States v. Wade,* 388 U. S. 218 and *Gilbert v. California,* 388 U. S. 263. *Smith and Samuels v. State,* 6 Md. App. 59, 67 (1969). Applying the standard to this case we have no difficulty in determining that the appellant was not denied due process of law, since the photographic identi-

fication procedures followed here were neither unduly suggestive nor conducive to misidentification. There was ample opportunity for Mr. and Mrs. Jackson and Preston James to have observed the appellant over the period of forty-five or fifty minutes during which the crimes were committed. There was no showing that Detective Reilly or any other police officer indicated in any way that the appellant was or even might have been one of the perpetrators. The appellant's photograph had been selected by Detective Reilly at random from mug pictures of those matching the general descriptions given by the Jacksons; at the time of the viewing the appellant was not even a suspect. The photographs were viewed by the individual members of the Jackson family before being viewed collectively, and there is no indication that any pressure was exerted on any member of the family to pick a certain photograph. In short, we believe that the photographic identifications were similar in relevant particulars to the identification in the *Smith and Samuels* case, *supra* at 78-79, and we find that in the factual surroundings of this case the viewing of the photographs did not deny the appellant due process of law. Consequently, the testimony concerning the photographic identification was properly admitted.

With respect to the appellant's identification at the extradition hearing, he first contends that his right to counsel was violated. This contention may be disposed of by noting that the record shows, and appellant has admitted, that appellant's then attorney was present at the extradition hearing at which the identification was made.

There remains the question whether the identification at the extradition hearing violated appellant's right to due process of law. In *Stovall v. Denno*, 388 U. S. 293, the Supreme Court of the United States recognized that a conviction could be properly attacked, independent of any right to counsel claim, on the ground that a pre-trial confrontation was "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to be a

denial of due process of law. This Court has similarly recognized that ground of attack. See, e.g., *Smith and Samuels v. State,* 6 Md. App. 59 (1969) ; *Tyler v. State,* 5 Md. App. 265 (1968) ; *Wethington v. State,* 7 Md. App. 79 (1969). To determine the validity of such an attack, it is necessary to examine the totality of the circumstances surrounding the identification. *Smith and Samuels v. State, supra.* This means, for example, that a confrontation may not be held to conform to the requirements of due process of law merely because an attorney was present at the scene of the challenged confrontation, although the presence or absence of the appellant's attorney is a highly relevant factor in the ultimate determination.

It is also significant here that the identification, although made in a courtroom, with a judge upon the bench, was not made as an incident of the extradition hearing. At the time the identification took place Mr. Jackson was seated with his wife and a deputy sheriff in the courtroom, the appellant was in the process of advancing through the courtroom to his seat, and the hearing was not, apparently, in progress at that moment.

However, as noted above, Mr. Jackson had ample opportunity to observe the appellant over the forty-five or fifty minute period during which the crimes had been committed, and he had previously identified the appellant from photographs under circumstances which were not conducive to misidentification. There is no indication that the deputy sheriff or anyone else told Mr. Jackson which door the appellant would enter through or how he would be garbed, or that anyone pointed out the appellant to Mr. Jackson as he entered the courtroom. The appellant was dressed in civilian clothing, apparently was not handcuffed, and the marshal who escorted him into the courtroom was several steps behind the appellant as he entered the room. Considering all of these facts we cannot say that the identification made by Mr. Jackson was made under circumstances so unnecessarily suggestive and conducive

to irreparable mistaken identity as to be a denial of due process of law. See, e.g., *Tyler v. State, supra; Wethington v. State, supra.*

## II—SUFFICIENCY OF EVIDENCE

The *corpus delicti* of the crimes were clearly established at trial by the testimony of the victims. The appellant's contention that the evidence was insufficient to go to the jury is concerned solely with an alleged lack of proof of the criminal agency of the appellant. Three of the victims, Mr. Jackson, Mrs. Jackson, and Preston James, identified the appellant at trial. Since it is settled that identification by the victim is sufficient evidence of criminal agency to sustain a conviction, see e.g., *Gunther v. State,* 4 Md. App. 181, 185 (1968), it seems clear that it would constitute sufficient evidence to take the issue to the jury.

## III—IMPEACHMENT BY PRIOR CONVICTIONS

During the trial, before the appellant elected whether he would testify, appellant's counsel requested the court to "exclude and rule inadmissible any questions and evidence concerning the one prior conviction" [1] of the appellant. After hearing argument on the request, the court ruled that if the appellant elected to testify the prior conviction would constitute proper impeaching evidence. The appellant then declined to testify.

The appellant contends that this ruling was erroneous and an abuse of the court's discretion. The asserted grounds for this contention are that the admission of a prior conviction to impeach the credibility of a defendant denies the defendant due process of law, the right to an impartial jury, the privilege against self-incrimination, and equal protection of the law.

We are, of course, aware of the recent criticism of the rule, prevailing in nearly all common law jurisdictions,

---

1. The appellant had pleaded guilty to armed robbery in 1965.

allowing the impeachment by prior convictions of a criminal defendant.[2] We have, on several occasions, heard the argument that such evidence is unfair to a defendant and in some cases works a great hardship. We have some sympathy with the argument but, even so, we do not feel disposed to strike down a rule so long embedded in the law of this State.[3]

However, we do not refrain from dictating changes in the rule merely because of its venerable history. We are convinced that the rule continues to serve a legitimate purpose and that it does not conflict with the protections afforded a criminal defendant by the United States Constitution.[4]

With respect to the alleged denial of due process of law, we think the Supreme Court has, by implication, recognized the validity of the rule in the face of such an attack. *Spencer v. Texas*, 385 U. S. 554 (1967).[5] See also *Singleton v. United States*, 381 F.2d 1, 4 (9th Cir. 1967).

The appellant's argument on the impartial jury ground revolves around an asserted unjustified excess of prejudice inherent in the introduction of a prior conviction. In the instant case the trial court distinctly noted that it would instruct the jury that the prior conviction could

---

2. See, e.g., Spector, *Impeachment Through Past Convictions*, 18 DePaul L. Rev. 1 (1968); Note, *Constitutional Problems Inherent in the Admissibility of Prior Record Conviction Evidence for the Purpose of Impeaching the Credibility of the Defendant Witness*, 37 U.Cin.L.Rev. 168 (1968); Comment, *Other Crimes Evidence at Trial: Of Balancing and Other Matters*, 70 Yale L. J. 763 (1961).

3. The present statutory authority for the practice, Md. Code, Art. 35, § 10 (1965 Repl. Vol.), has remained unchanged for over one hundred years. See Law of March 2, 1864, Ch. 109, § 5, sub-§ 1 [1864] Md. Laws 138.

4. The appellant baldly asserts that the rule also conflicts with the Maryland Constitution. No argument has been made upon this point, however, and we consider this question to have been abandoned.

5. At least one court and one commentator believe that *Spencer* provides the complete answer to the question of the constitutionality of this form of impeachment. *People v. Robbins*, 88 Ill. App. 2d 447, 232 N.E.2d 302, 306 (1967); Note, *To Take the Stand Or Not to Take the Stand: The Dilemma of the Defendant With a Criminal Record*, 4 Colum. J. L. & Soc. Prob. 215, 219-20 (1968).

be considered only in assessing the defendant's credibility. It appears to the Court that limiting instructions in these circumstances would have successfully prevented prejudice of an unconstitutional magnitude. *Spencer v. Texas, supra* at 561-65, supports this conclusion; and we do not find this authority sufficiently shaken by *Bruton v. United States,* 391 U. S. 123 (1968) (indicating that in some contexts limiting instructions will not be sufficient to dispel undue prejudice) to compel a variant result.[6]

The contention concerning the privilege against self-incrimination was, it seems to us, laid to rest many years ago by the Supreme Court. In *Raffel v. United States,* 271 U. S. 494, 496-97 (1926) the Court said:

> "The Fifth Amendment provides that a person may not 'be compelled in any criminal case to be a witness against himself.' . . . The immunity from giving testimony is one which the defendant may waive by offering himself as a witness. [citations omitted] . . . He may be examined for the purpose of impeaching his credibility. *Reagan v. United States,* [157 U. S. 301], 305; *Fitzpatrick v. United States,* [178 U. S. 304], 316."

In *Reagan v. United States, supra* at 305, the Court had said, "His [a criminal defendant's] credibility may be impeached, and by the same methods as are pursued in the case of any other witness;" and the gist of this statement was repeated, in dictum, in *Brown v. United States,* 356 U. S. 148, 154 (1958).

The ultimate basis of any claim of denial of equal pro-

---

6. The Supreme Court has noted in *Spencer v. Texas, supra* at 565 n.8, that:

> "Indeed the most recent scholarly study of jury behavior does not sustain the premise that juries are especially prone to prejudice when prior-crime evidence is admitted as to credibility. Kalven & Zeisel, The American Jury (1966). The study contrasts the affect of such evidence on judges and juries and concludes that 'neither the one nor the other can be said to be distinctively gullible or skeptical.' Id., at 180."

tection of law must rest, as the appellant asserts his does, upon an arbitrary discrimination. However, although the equal protection clause forbids all invidious discrimination it does not require identical treatment for all persons without recognition of differences in relevant circumstances. If the criminal defendant be compared to other witnesses, it is clear that there is no discrimination, for in Maryland a witness not the defendant may be impeached by proof of a criminal conviction. *Green v. State,* 161 Md. 75, 83-87 (1931). If the criminal defendant who has a record of previous convictions be compared to a criminal defendant who has no such record, there is no invidious discrimination because the different treatment accorded these defendants results from a relevant difference in their background. In Maryland not every conviction can be used to impeach, but only those which have some tendency to show that the defendant is not to be believed under oath. See, e.g., *Huber v. State,* 2 Md. App. 245, 256-58 (1967); *Woodell v. State,* 2 Md. App. 433, 438-39 (1967). In the instant case the prior conviction was of robbery, and "in common human experience acts of deceit, fraud, cheating, or stealing, for example, are universally regarded as conduct which reflects adversely on a man's honesty and integrity." *Gordon v. United States,* 383 F. 2d 936, 940 (D.C. Cir. 1967). For these reasons we think that there was no denial of equal protection of law.

The appellant's ultimate complaint with respect to the prior conviction is that the trial court abused its discretion in ruling that the conviction would be admissible. In *Huber v. State, supra* at 257, we stated:

> "As no rigid classification of crimes is possible, the court must exercise its discretion in admitting the fact of a criminal conviction, and its decision will not be interfered with on appeal, except where the evidence is so clearly irrelevant that its admission could not be said to be within the discretion of the trial court. *Link-*

*ins v. State* [202 Md. 212] ; *Taylor v. State* [226 Md. 561]."

The prior conviction of robbery was not so irrelevant and we find no error in the court's ruling.

## IV—JURY INSTRUCTIONS

The court instructed the jury on the elements of each of the crimes the appellant was charged with having committed. The court then gave a definition of intent, as follows:

> "Intent is the express mental action in its most advanced point or as it is actually accompanied by an outward corporal act which has been determined on . . .
>
> "It is the exercise of the intelligent will, the mind being fully aware of the nature and consequences of the act which is about to be done, with such knowledge and full liberty of action, willing and electing to do it."

At the conclusion of the instructions appellant's counsel stated to the court, "Your Honor, I submit that all of these crimes are specific intent and that there should be an instruction that they are specific intent crimes and further there should be an instruction of what specific intent is." The court then additionally instructed the jury that,

> ". . . the Court . . . advises you further that you must find there was a specific intent on behalf of the defendant, in each of these counts, to commit the crimes as I have defined them to you.
>
> "Intent being an essential element of these crimes."

The appellant contends that the instructions were still deficient as to the intent necessary to justify conviction of the appellant. We have considered the instructions in their entirety and conclude that the instructions fully and

adequately covered the law applicable in this case. See *Graef v. State,* 1 Md. App. 161, 171-72 (1967).

For the above reasons the judgments must be affirmed.

*Judgments affirmed.*