## JOSEPH ADOLPHUS KING *v.* STATE OF MARYLAND

[No. 529, September Term, 1972.]

*Decided July 5, 1973.*

The cause was argued before MORTON, MOYLAN and SCANLAN, JJ.

*William O. Goldstein* and *Stran J. Funk* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Philip Epstein, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Joseph Adolphus King, was convicted in the Criminal Court of Baltimore by a jury, presided over by Judge Basil A. Thomas, of rape and of armed robbery. Although he raises three contentions upon this appeal, it will only be necessary for us to discuss his claim that an impermissibly suggestive photographic viewing should not have been referred to in evidence and was, furthermore, a fatal taint upon the subsequent in-court identification.

Mrs. Joann Downey was the victim of both the rape and

the armed robbery which occurred on the upper level of a downtown parking garage at approximately 6:30 p.m. on December 15, 1971. The only evidence against the appellant was the identification of him made by Mrs. Downey. The appellant made an appropriate motion to suppress both direct evidence of the pretrial identification and the in-court identification, which he claimed was based upon it. That motion was denied. The appellant made timely objection at the trial when the identifications were made.

It is clear that a claim of impermissible suggestiveness in a photographic viewing is based upon the due process clause as in *Stovall v. Denno*, 388 U. S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1199, and not upon the Sixth Amendment "right to counsel" clause as in *United States v. Wade*, 388 U. S. 218, 87 S. Ct. 1926, 18 L.Ed.2d 1149, and *Gilbert v. California*, 388 U. S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178. The claim must be evaluated, therefore, "in light of the totality of surrounding circumstances." *Simmons v. United States*, 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247.

It is also clear that in evaluating the totality of the circumstances, we are called upon to make an independent, reflective constitutional judgment on the facts. *Walker v. State*, 12 Md. App. 684, 280 A. 2d 260; *Dillingham v. State*, 9 Md. App. 669, 267 A. 2d 777 (concurring opinion by Orth, J.).

As we make that independent, reflective constitutional judgment, we apply to the facts at bar the standard set out in *Simmons*, at 390 U. S. 384:

> "[W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

Mrs. Downey was called to the Bureau of Identification in the Central Police Station at approximately 11:30 p.m. on December 15. For the next hour and one-half to two hours,

she viewed approximately 250 photographs of Negro males. According to her initial testimony, she selected the photograph of the appellant as being a picture of her assailant at approximately 1 a.m. on the morning of December 16. Officer Robert Bowman also testified that Mrs. Downey made such a photographic identification. If that were all the evidence that was before us, we would have no problem in finding that the procedure was not impermissibly suggestive. Subsequent events, certain inconsistencies and partial retractions erode our confidence, however, in the positive nature of that first identification. Officer Bowman filed an offense report that contained the following entry:

> "On December 15th at 1110 hours this date, Mrs. Downey was taken to the B. of I. to view photographs with negative results at this time."

He later explained away this report by saying that he had filled out his report before the viewing had been completed and before Mrs. Downey made the identification. At no time, however, did Officer Bowman file a supplementary report. A report that he did file on December 16 made no mention of a positive identification having been made on the preceding night. No official record ever reflected a correction of that first report which indicated "negative results." Mrs. Downey later stated that she was called back on the following day because the picture that she had identified on that first night "wasn't a very good picture, and that is why I wanted him to get more pictures. I wanted to see more pictures."

Officer Bowman was specifically asked if he ever reduced to writing the ostensible identification made on the night of December 15-16. He replied, "No." He was asked why. He replied:

> "It was after she had finished — we had finished the reports, and the reports were turned in that she made the identification. The picture that she picked out — the defendant's head was in a — cocked in a funny position. This is what she told me, and she wanted to see other pictures of him."

He subsequently stated again that the lack of a written report was because of the nature of the identification which had been made:

"There was no report written. Because of the picture that she picked out, she wanted to see other photographs of the man."

If a firm identification of the appellant had been made on the night of December 15-16, an arrest warrant would have been issued for him and that would have been the end of the matter. Inexplicably, Mrs. Downey was asked to return to police headquarters during the afternoon of December 16. The first thing that occurred there was that she was taken to the Crime Laboratory and there proceeded to give descriptions from which a composite picture was prepared. The very preparation of a composite picture belies the prior making of a good photographic identification. After the preparation of the composite picture, Mrs. Downey was shown additional photographs. At first she was shown a group of five pictures from which she picked that of the appellant. An hour later, she was shown a second set of five pictures, with the appellant being the only repeater in the group. Again, she picked the appellant. Again, no explanation was given as to why the second viewing was necessary. Shortly thereafter, yet a third set of five photographs were shown to Mrs. Downey. Again, the appellant was the only repeater in the group. Again, he was selected. This entire process is the sort of thing that was referred to adversely in *Simmons*, at 390 U. S. 383:

"This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized."

The appellant had asked before trial for copies of all police offense reports relating to this case. The State's Attorney's Office furnished all reports of which it had any knowledge.

On the day of trial, Officer Bowman produced a report, dated December 16, which for some strange reason had not been furnished beforehand to the State's Attorney or to the appellant. That report does not refer to three separate identifications having been made by Mrs. Downey. It states simply as follows:

> "She was shown more pictures from the B. of I. and picked out a picture of Joseph Adolphus King *as a strong possibility.*"

Officer Bowman was questioned about that language in view of the earlier testimony that positive identifications had been made on December 16. He replied, "This was a bad choice of words on my part in the report."

After the December 16 identification, an arrest warrant was taken out for the appellant. There then occurred the most disturbing episode in the whole course of these photographic viewings. On December 23, Mrs. Downey was taken out by Officer Bowman and a Sgt. Conjour in a patrol car for several hours to ride around and "see if they could locate the defendant." They did not locate the appellant. During that ride, Mrs. Downey was shown four photographs. All four were of the appellant. They were different shots of the appellant. Officer Bowman explained that the purpose for taking Mrs. Downey out on that occasion was to allay her fears that she had made a misidentification. Officer Bowman explained that Mrs. Downey "had reason to believe that she would be sued for false arrest." Officer Bowman did not explain how, if the earlier identification of the appellant had been a mistake, a bolstering of that identification would correct the mistake. He added a cryptic additional explanation:

> "Also in my report, where I had used the words, 'strong possibility,' I realized that they were the wrong words to use. These pictures were shown to her to ease her mind — "

In our judgment, Mrs. Downey was barraged with photographs of the appellant to the point of being

brainwashed. After the three sets of photographs on December 16 in which the photograph of the appellant was the only one to recur, and in view of the repetitive exposure of Mrs. Downey to four separate photographs of the appellant on December 23 "to reassure her" that she would not "be sued for false arrest," we are not persuaded that the later lineup identification on January 5 and the later in-court identification were not the products of this repeated exposure. We are mindful of what was said in *Simmons,* at 390 U. S. 383-384:

> "Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification."

Looking at the totality of events between December 15 and December 23 as to photographic viewings, we are persuaded that the whole process, in the aggregate, was impermissibly suggestive. Evidence of it should have been excluded from the trial.

The convictions, therefore, must be reversed.

*Judgments reversed; case remanded for a new trial.*