LEWIS SALLIE a/k/a Louis Sallies *v.* STATE
OF MARYLAND

[No. 175, September Term, 1974.]

*Decided February 14, 1975.*

The cause was argued before Orth, C. J., and Powers and
Moore, JJ.

*Victor J. D'Avella, Assigned Public Defender,* with whom
was *Henry C. Engel, Assigned Public Defender,* on the brief,
for appellant.

*Alexander L. Cummings, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edwin H. W. Harlan, Jr., State's Attorney for Harford County,* and *Edward Lilly, Assistant State's Attorney for Harford County,* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

The dwelling house of Mr. and Mrs. Eugene Monger,[1] in Aberdeen, Harford County, was burglarized in the nighttime on 15 August 1973. A sum of money and a wallet, valued at less than $100, were stolen.

Louis Sallie, the appellant here, was indicted for the crimes. He was tried before a jury in the Circuit Court for Harford County, and was convicted of burglary and petty larceny. After sentences were imposed, he appealed.[2]

In this Court he contends first that the trial judge erred in denying his motion to suppress any evidence identifying him as the burglar because a pretrial viewing of photographs by Mr. Monger was so impermissibly suggestive that it tainted any possible identification in court. He contends further that the judge erred in denying his motion for judgment of acquittal, because the evidence was not sufficient to permit the jury to find that he was the criminal agent.

As he concludes in his brief:

"The Appellant would concede that the State had proven all the necessary elements of the crime of burglary, but they failed in establishing that necessary relationship between the offense

---

1. In the indictment the name of the victims is spelled Munger. Throughout the transcript it is spelled Monger. There is nothing in the record which resolves the discrepancy. We shall use the spelling in the transcript.

2. The record comes to us as containing two appeals. In the first, Lewis Sallie and a codefendant were indicted for larceny of a motor vehicle and for its unauthorized use. Sallie pleaded guilty to unauthorized use. The burglary indictment is against Louis Sallies. It is clear from the record that his correct name is Louis Sallie, and we shall so refer to him. Sentences in both cases were imposed at the same time. The appeal is so worded as to include both cases. No error in the unauthorized use case is asserted here. We shall affirm that judgment without further discussion.

committed and the person who committed that offense."

Around 10:00 o'clock on the evening of 15 August 1973 the Mongers were visiting with neighbors across the street. They had left their two small children at home, asleep upstairs, and had left their front door closed, but unlocked. Mr. Monger intended to return to the house from time to time to check on the children. Another neighbor called and told the Mongers' host that two men had just entered the Mongers' house through the front door. Mr. and Mrs. Monger and others ran across the street. Mr. Monger found that his front door was locked, and he could not get in. He lifted the mail slot, and through the opening he could see most of the living room, a hall, and part of the kitchen. Lights were burning. He saw two men. One was going from the living room to the kitchen. Mr. Monger had a side view of him, and observed his clothing. He then saw the second man, backing out of a corner of the living room. The man turned, and ran into the kitchen. Mr. Monger observed his clothing, and also saw what he described as a diamond shaped scar on the man's right cheek.

Both men left the house through the glass sliding doors which opened to the rear from the kitchen. Mr. Monger ran around the end of the building, and saw the two men running. Someone called the police, who arrived within three or four minutes. Officer Buck attempted to follow the trail of the fugitives with a police dog, but the dog lost the trail when it crossed a paved highway. Mr. Monger described both men to Officer Buck, in considerable detail as to clothing, and mentioned the diamond shaped scar or mark on the right cheek of one of the men.

Aaron Stanley, a 12 year old boy who was riding his bicycle up and down the street, told Officer Buck that he had seen two young men, both of whom he knew, at the curb in front of the house next to Mongers', and when he next rode down the street a very short time later, the police wagon was coming. He said that the young men he saw were Vivan Dennis and "Fuzzy". He described the clothing each was

'wearing. Officer Buck knew both of the young men. He knew that "Fuzzy" was a commonly used nickname for Louis Sallie. He had seen Sallie and Dennis together a half hour before the burglary, a few blocks away, dressed as described by Mr. Monger and by Aaron Stanley.

Appellant's motion to suppress identification testimony was heard by the trial judge after the jury was selected and sworn, but out of the presence of the jury. Appellant offered evidence at that hearing through Detective Gruber, Officer Buck, and Mr. Monger. The day after the burglary, Officer Buck asked Detective Gruber to make up a group of photographs, including Sallie and Dennis, and show them to Mr. Monger. The group consisted of 12 black and white "mug shots" of young Negro males. Each subject is shown full face, from the top of the head to approximately the breast line. We have examined all of the photographs carefully, and we can find nothing other than face and hair which would distinguish one from the other. It appears that three or four of the 12 were wearing a mustache. Sallie was not. None had a beard. Five or six, including Sallie, wore what is called a bush, or modified bush, hair style. There are easily distinguishable variations among the 12 photographs in the skin shade, eyes, foreheads, lips, and general facial contours of the subjects. On Sallie's photograph can be seen a diamond shaped mark on his right cheek.

We need not relate the details of the procedure by which Detective Gruber showed the book of 12 photographs to Mr. Monger the next evening, except to say that there was not even a hint of anything suggestive about it. Mr. Monger readily identified Sallie. He did not identify Dennis. He noted the mark on Sallie's cheek as part of the reason for identifying him. Appellant relies heavily upon that mark, as well as upon differences in age, height, and weight of the subjects in contending that the very selection of the photographs making up the group was impermissibly suggestive.

Whatever differences a viewer of these photographs may discern in the age, height, and weight of the subjects are, to say the least, not significant, and are as likely as not to be

incorrect. The issue of suggestiveness narrows down to the diamond shaped mark which could be seen on Sallie's face in his photograph.

That mark was indeed an identifying characteristic. Observation of identifying characteristics is the core of any identification process. Differences among individuals are the very means by which one may be distinguished from all others. Similarities can lead to confusion, and even to mistake. The not-unheard-of trick of planting a look-alike in the courtroom surely is not employed to aid in the search for truth, but to thwart that search.

Appellant argues that his mark is unique. Every individual is unique. The mouth, the lips, the teeth, the chin, the cheeks, the nose, the eyes, the forehead, the ears, the hair, or any combination of two or more of those and other features, make every individual unique. They make him different from all others. They are the basis upon which any person is visually distinguished from other persons. The more subtle the distinctions, the more difficult the identification, and the greater the potential for error. If the burglar in this case had not had such a distinctive mark, then Sallie's mark would have cleared him forthwith as a suspect. The fact that the burglar had the mark, and that Sallie had it, and that the mark is unique, made his identification inevitable indeed, but also made it more rather than less reliable.

In 1 *Wharton's Criminal Evidence* § 188 (Torcia 13th ed. 1972) the author says:

> "The identification of the accused by the witness may be based on a recognition of his physical characteristics and appearance, or by some mark on, or peculiarity of, the accused."

We do not find suggestive the photographic viewing by Mr. Monger, nor do we see in it any deviation from the principles expressed in *Simmons v. United States*, 390 U. S. 377, 88 S. Ct. 967, 19 L.Ed.2d 1247 (1968), where the Supreme Court said, at 384:

> "* * * we hold that each case must be considered on

its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

In *Smith and Samuels v. State*, 6 Md. App. 59, 250 A. 2d 285, *cert. denied*, 254 Md. 720, 255 Md. 743 (1969), *cert. denied*, 397 U. S. 1057, 90 S. Ct. 1402, 25 L.Ed.2d 674 (1970), Judge Orth analyzed the law relating to photographic identifications, and outlined the procedure to be followed when they are questioned. Among the many other cases in which we have considered allegedly impermissible suggestiveness in a photographic viewing are *Jordan v. State*, 19 Md. App. 283, 310 A. 2d 575 (1973); *Cousins v. State*, 18 Md. App. 552, 308 A. 2d 692, *cert. denied*, 270 Md. 738 (1973); *King v. State*, 18 Md. App. 266, 306 A. 2d 258 (1973); *Dorsey v. State*, 9 Md. App. 80, 262 A. 2d 591, *cert. denied*, 258 Md. 727 (1970); and *Nance v. State*, 7 Md. App. 433, 256 A. 2d 377 (1969), *cert. denied*, 256 Md. 747, *cert. denied*, 398 U. S. 954, 90 S. Ct. 1881, 26 L.Ed.2d 296 (1970). The *Nance* case is cited in Annot., "Photographic Identification — Suggestiveness", 39 A.L.R.3d 1000 (1971), at 1011 as stating:

"* * * that the rule to be followed with regard to photographic identifications is that if it is shown that a pretrial identification by photograph, on the totality of the circumstances surrounding it, was so unduly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, the admission of evidence of such identification or a subsequent in-court identification is determined pursuant to the exclusionary rules * * *."

We hold that there was nothing about the photographic viewing by Mr. Monger that would reduce the trustworthiness of a subsequent courtroom identification by him. The trial judge correctly denied the motion to suppress.

Appellant next argues that even though the judge's ruling permitted a courtroom identification by Mr. Monger, the identification made by the witness in court was not sufficient to stand up against a motion for judgment of acquittal. He refers to that phase of Mr. Monger's testimony before the jury which he says constituted the identification. The transcript reads:

"Q [By Mr. Lilly, Assistant State's Attorney] Now, this second man that you saw, do you remember what he was wearing?

A He was wearing a sweat shirt with green plaid pants.

Q Do you know what color the sweat shirt was?

A Gray.

Q Now, was there anything else unusual about this man that you saw, this second man? Could you describe him for the jury?

A He was about five foot-seven or five foot-eight, kind of hard to tell, through the mail slot, how tall he actually was. And when he turned and started to run away I noticed that on his right cheek he had a diamond-shaped scar.

Q On his —

A Or a diamond shape on his right cheek.

Q A diamond-shape scar, did you say?

A Right.

Q Do you remember anything else about this man? What kind of hair did he have, do you remember?

A He had a — it wasn't really a big Afro, it was Afro style but it was close, it was not clipped close but it was packed in close.

Q And do you know what race this man was?

A He was a black male.

Q What about the first man, what race was he?

A He was black also.

\* \* \*

Q Now, at this time, I would ask you to look around the courtroom and see if you can identify the second man who you saw. Is he in fact present in the courtroom now?

MR. D'AVELLA [Defense counsel]: I am going to have to object * * *

* * *

THE COURT: Overruled. You may answer.

Q (MR. LILLY) You may answer the question.

A He is sitting there in the blue shirt.

Q I see four men in blue shirts there in the courtroom.

A He is sitting with both hands stuck around the side of his face.

Q Would you walk over and indicate?

A This man here.

Q The man seated next to the lady with the white blouse?

A Right."

Appellant refers also to the testimony of Aaron Stanley, who made an identification in court which appellant likewise says was not sufficient to enable the jury to find the necessary criminal agency. The testimony of Stanley at that point was:

"Q [By Mr. Lilly] Aaron, I will ask you again, what was the identity of those two people that you saw, one standing up and one sitting down?

* * *

Q Now, do you know their names, the names of these two boys or men?

A Uh-huh.

Q What are their names?

A Vivan and Fuzzy.

* * *

Q  Now, this Fuzzy that you saw sitting there, was he standing or sitting?

A  Looked — if I could picture right, it looked like he was sitting.

Q  He was sitting and Vivan was standing. Do you know Vivan's last name?

A  (Witness nodding in the affirmative.)

Q  What is his last name?

A  Dennis.

Q  Right. Now, this Fuzzy, that you said you saw there with Vivan Dennis, is he present in the courtroom today? Do you see him?

A  Uh-huh.

Q  Where is he?

A  Right here.

Q  In the blue coat and the green shirt?

A  (Witness nodding in the affirmative.)

Q  Now, what did you do when you saw the two men?

A  I just rode around in a circle on the bike and I left.

\* \* \*

Q  Okay, Aaron, did there come a time when you returned back to where you saw Vivan and Fuzzy?

A  Yes.

Q  How long were you gone before you came back?

A  About less than a minute.

Q  Less than a minute. And what if anything happened when you got back?

What was happening when you got back to that area?

A  Well, Mr. Buck was taking the dog out of the car.

Q Who is Mr. Buck?

A The officer."

During cross examination of the witness Stanley by defense counsel the transcript shows:

"Q Now, I think you said, when Mr. Lilly asked you a question, that you rode by and you saw Fuzzy on the sidewalk, right?

A Yes, I seen him on the sidewalk and I just turned around in a circle.

Q And then another minute I think you had said another minute later he was gone, and the policeman was there with the dog, is that right?

A No, when I was going home, when I was about ready to stop, my sister seen a car, come up the road. She thought it was an ambulance but it was a wagon and we just followed it.

Q What did you say — to Mr. Lilly about a minute later and then the police were there? What do you mean by that?

A As soon as I left there, about a minute later, there was — they were coming up the road.

Q How much time was it from the time you first saw Fuzzy until you saw the policeman? Was it right away or a long time go by?

A It was about less than a minute."

And further, in recross:

"Q Aaron, how do you know Fuzzy?

A Because usually he be around the way, hearing a lot of people saying the name.

Q How do you know it was him?

A Him?

Q Uh-huh.

A Because when the car came by then we seen both of them walking over to the apartments.

Q  What do you mean when you saw the car come by?

A  A Mustang.

Q  You said we, who is we?

A  Me, my brother, and my sister.

Q  Uh-huh. And do you know somebody by the name of King Rat?

A  (Witness nodding in the negative.)

Q  Do you know — you know Vivan Dennis though?

A  (Witness nodding in the affirmative.)

Q  And the only way you know Louis is because you hear his name?

A  I be close by.

Q  Do you live near Louis?

A  Witness nodding in the negative.

Q  You don't live near him?

A  (Witness nodding in the negative.)

Q  And how do you know him then?

A  Because then when I would be riding by I hear people say his name and that is how I know his name."

Officer Michael C. Buck, of the Aberdeen Police, was a witness for the State. He related that he had responded immediately to the call, and talked to Mr. Monger. The officer testified:

"A  He advised me that he immediately went to his residence, found the front door locked. He looked in the mail slot, which is cut in the door, and observed two subjects inside his residence. He gave me a description of these two subjects. Both of them were black males. One had a sweat shirt on, green plaid, green and white plaid pants, had a diamond tattooed on his cheek. Another subject wearing red pants, white shirt, white belt and carrying a white hat.

\* \* \*

Q (MR. LILLY) All right. This description that you received, of the clothing and the diamond tattoo on the face of one of the individuals, did this have any particular significance to you?

A I had observed two subjects approximately one-half hour before this incident on South Philadelphia Boulevard or U.S. Route 40.

Q And did you recognize these individuals that you observed?

A Yes, sir.

Q Who were they?

A Louis Sallie and Vivan Dennis.

Q Now, what was this scene where you saw these two individuals?

A South Philadelphia Boulevard just by Dunkin Donut, Platter Street intersects.

Q How far would that be from the Monger home?

A My judgment would be six to seven blocks, sir.

Q What were Vivan Dennis and Louis Sallie doing at that time?

A Talking together on the street.

Q Do you remember what they were wearing at that time?

A Yes, sir. Louis Sallie had a gray sweat shirt on, a green and white plaid pants. Vivan Dennis had a pair of bright red pants on, white shirt, white belt and was wearing a white open top cap.

Q Was anyone else with Vivan Dennis and Louis Sallie when you saw them there?

A No, sir."

One witness was called by the defense. She was Carlotta Sallie. She said that Louis Sallie was her brother. She said that on the evening of 15 August 1973 her brother was at home about 9:00 o'clock, that he watched a television program with her from 10:30 to 11:30, and that he did not go out again after that. During her testimony she referred to

her brother sometimes as Louis and more frequently as Fuzzy. She said he was also known as Fuzzy Louis.

In *Rife v. State,* 9 Md. App. 658, 267 A. 2d 326 (1970),[3] we considered a courtroom identification and expressed the view that it was insufficient. The net effect of the testimony in *Rife* by the only witness who was asked in court to make an identification of a perpetrator of a robbery was similar in effect to the testimony of Mr. Monger which we have quoted. After disposing of the case on the basis of an unreasonable seizure of evidence, we said in *Rife* at 664:

> "Despite our holding we think it advisable to discuss briefly the other two contentions made by appellant. Urging that the evidence was not sufficient to sustain the conviction, appellant centers on the proof of his criminal agency, claiming that none of the State's witnesses identified him as one of the robbers. We consider this contention so we may point out that what is apparent to those in attendance at the trial, may not be revealed by the record."

We then quoted from the transcript of the trial in that case. It showed that the witness walked around the courtroom, walked up to one person, and said, apparently pointing, "This fellow here". We alluded to several inferences that might be arguable, but said, at 666:

> "But to leave the identification of a defendant as the criminal agent to these types of speculations and inferences can hardly be said to be a proper manner for the State to fulfill its burden of proving an accused guilty beyond a reasonable doubt. On the record all that is directly shown is that the witness identified a person in the courtroom. All the State had to do was to state for the record, if that was the fact, that the person identified was the defendant."

---

**3.** See Metallo v. State, 10 Md. App. 76, 267 A. 2d 804, *cert. denied,* 259 Md. 734 (1970), which involved the separate trial of Rife's codefendant, whose conviction we affirmed.

We indulged in that dictum in *Rife* for the declared purpose of emphasizing "that what is apparent to those in attendance at the trial, may not be revealed by the record." Not all evidence which reaches the eyes and ears of a judge and jury is, or can be, recreated for appellate review. What might have been clear and certain to the trier of facts, and to all persons involved in a trial, may appear in a transcript on appeal to depend upon speculation and inference. But speculation may vanish, and inference may be supported, if recorded words describe what has been presented as physical evidence before the very eyes of the jury and the judge.

For these reasons we expressed in *Rife* the admonition that when a witness makes an identification in court of a person on trial by pointing, touching, describing, or otherwise indicating the person in a manner clear to observers, the prosecutor should state for the record that the person identified is the defendant.

It may be said that a prosecutor's saying what he perceives to be a fact does not make it so, and is not evidence. Yet such a "statement for the record" is accepted universally for the very realistic and very sound reason that it records what he, and all others, have seen, just as the court stenographer records what has been heard and seen by all.

We cannot conceive that such a statement would be permitted to stand unchallenged if it were not true. It would be utterly unrealistic to suppose that a jury or a trial judge would convict a defendant when some other person has been pointed out at the trial as the criminal, and the discrepancy remains unexplained.

Thus we shall continue to consider recorded statements, by any participant in a trial, describing non-verbal evidence, and not disputed, as being reliable and trustworthy for the purpose of appellate review. Although we do not say that the absence of such a descriptive statement in the record necessarily renders identification evidence too speculative to be a trustworthy basis for conviction, we reemphasize the

need to let the record reflect, for appellate review, all evidence conveyed, by non-verbal means, to the trier of the facts.

The ideal of our system of justice and its administration in the courts is to practice fundamental fairness to all litigants and to society alike, and to afford to every person accused of crime the protection of due process of law. In the case before us we do no violence to that ideal by using common sense and common experience to say that the evidence was sufficient to show that Louis Sallie was a criminal agent in the Monger robbery. Any other view would lend credence to the feeling, by no means rare, that the laws and the courts are sometimes out of touch with reality. The feeling is not a new one.[4]

Here it is not necessary to rely upon the identifications of Louis Sallie made before the jury by Eugene Monger and Aaron Stanley. Even if no witness physically identifies a defendant in the courtroom, identification by name is enough. 1 *Wharton's Criminal Evidence* § 103 (Torcia 13th ed. 1972) says:

> "Identical names give rise to a presumption of identity of person. This presumption is slight when the name is common and there are many persons having the same name. It increases in strength with circumstances indicating the improbability of there being two persons of the same name at the same time and place, and where there is no evidence that there is any other person bearing that name. Identity, then, can be presumed from names coupled with other circumstances."

Louis Sallie was the name of the defendant on trial. It is significant that before the jury was selected, in the absence of the witnesses but in the presence of the prospective jurors, the court identified the defendant, as Louis Sallie, to the entire jury panel. In Mr. Monger's testimony he

---

4. Charles Dickens, through a character in Oliver Twist, expressed that feeling when he wrote, "If the law supposes that," said Mr. Bumble .... "the law is a ass — a idiot."

described in detail the two men he saw in his house. Another witness similarly described two men he saw at the curb in front of the house only minutes before the burglary. He also named the two men, as "Fuzzy" and Vivan Dennis. A police officer who knew both of the men saw them a half hour before a few blocks away, together, clothed as described by the other witnesses. The officer knew that "Fuzzy" and Louis Sallie were the same person. Sallie's sister confirmed that her brother Louis was known as "Fuzzy".

The motion for judgment of acquittal was properly denied.

*Judgments affirmed.*